7 A.3d 536

Betty A. APPIAH, et al.

v.

Bruce Edward HALL, et al.

No. 33, Sept. Term, 2009.

Court of Appeals of Maryland.

Oct. 27, 2010.

534

536

M. Albert Figinski and Jeffrey J. Utermohle (The Law Offices of Peter G. Angelos, P.C., Baltimore; David E. Haynes,

The Cochran Firm, Washington, D.C.), on brief, for petitioners.

Thomas J. Minton (Goldman & Minton, P.C., Baltimore), on brief, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BARBERA, J.

In this case, we consider an appeal from the grant of summary judgment in favor of Respondents, the Maryland Port Administration ("the MPA") and P & O Ports of Baltimore, Inc. ("P & O"). Petitioners, Betty A. Appiah and Veronica Agyarko, filed suit in the Circuit Court for Baltimore City against Respondents, alleging liability for the death of Stephen Appiah, Petitioners' husband and son, respectively, after he sustained mortal injuries while working at the Seagirt Marine Terminal ("Seagirt"). Seagirt is owned by the MPA and, pursuant to contract, operated by P & O. For reasons we shall explain, we hold that the Circuit Court properly granted summary judgment in Respondents' favor.

### I.

Seagirt is a shipping terminal located in the Port of Baltimore that facilitates the ground transportation of cargo containers arriving in Baltimore by ship. Although the MPA owns Seagirt, the agency does not conduct stevedoring (loading and unloading vessels) or terminal operations at that terminal. To provide these services during the time period relevant to this appeal the MPA contracted with P & O. At that time, P & O was responsible for the operations on 190 acres of the 284 acres comprising Seagirt. While P & O provided oversight for the operations at Seagirt, various other contractors leased space at Seagirt from the MPA to provide services directly to shipping and other companies doing business at Seagirt.

Marine Repair Services ("Marine Repair"), a company that stores, monitors, repairs, services, and loads refrigerated shipping containers called "reefers," leased space at Seagirt in an area known as "Reefer Row." Once reefers are delivered to Reefer Row, Marine Repair connects them to shore power and monitors their temperatures.

Mr. Appiah worked for Marine Repair as a longshoreman. A few days before the accident involving him, Respondent P & O unloaded a reefer containing a shipment of Bailey's Irish Cream from a vessel owned by Mediterranean Shipping Lines ("Mediterranean") and placed the reefer in a slot on Reefer Row. The reefer was to be delivered to Washington Wholesale Liquors ("WWL") in Washington, D.C. On September 30, 2003, the day of the accident, a customs broker notified Den–El Transfer, Inc. ("Den–El"), a trucking company hired by WWL to pick up and deliver reefers, that the reefer was available for pick up. Later that same day, Den–El sent a driver, Bruce Hall, to Seagirt to pick up the reefer. Upon his arrival, a P & O employee reviewed Mr. Hall's paperwork and directed him to Marine Repair's office trailer. There Mr. Hall met Marine Repair's mechanic supervisor who informed him that Mr. Appiah, who was at Reefer Row, would help hook the reefer to the truck.

When Mr. Hall arrived at Reefer Row, he found Mr. Appiah, who then confirmed Mr. Hall's paperwork and went to retrieve a forklift to install a mobile generator ("genset") on top of the reefer. Mr. Appiah returned with a forklift, ladder, and genset. He parked the forklift behind Mr. Hall's truck, which was parked a few feet in front of the reefer. Mr. Appiah then began installing the genset on top of the reefer. Before Mr. Appiah finished, however, the mechanic supervisor arrived and removed the forklift from between the truck and the reefer.

Mr. Hall saw the supervisor drive the forklift away and give what appeared to be an "all clear wave." Mr. Hall then began to back up his truck to hook it to the reefer. Mr. Hall at that time was unaware that Mr. Appiah was standing between the

truck and the reefer while winding up the power cord from the shore power source no longer plugged into the reefer. As a result, Mr. Appiah was pinned between the truck and the reefer. He suffered severe injuries from which he died on October 3, 2003.

### The Litigation

Petitioner Betty Appiah, as the personal representative and surviving spouse of Mr. Appiah, filed a wrongful death and survivorship action in the Circuit Court for Baltimore City, naming as defendants Mr. Hall, Den–El, P & O, and the MPA. She twice amended the complaint, first, to add Samuel Shapiro & Co., Inc. ("Shapiro") and, then, to add WWL as defendants.

Thereafter, Petitioner Veronica Agyarko (Mr. Appiah's mother) filed a complaint in the Circuit Court for Baltimore City, naming these same six defendants and presenting substantially the same allegations as in Ms. Appiah's complaint. Consequently, the Circuit Court ordered that the two cases be consolidated. Subsequently, Petitioner Betty Appiah filed a Third Amended Complaint, citing new allegations and facts in support thereof.

Respondents MPA and P & O each filed a motion for summary judgment against both Petitioners. In support of those motions, Respondents argued, inter alia, that they were not liable for the negligent acts that caused Mr. Appiah's death because those acts were performed by independent contractors over whose work Respondents retained insufficient control to subject them to liability. Respondents further argued that Petitioners' claims were time-barred under the Maryland Wrongful Death Act, Maryland Code (2006 Repl. Vol.), §§ 3–904(g)(1) and 5–101 of the Courts & Judicial Proceedings Article.

The Circuit Court, on December 14, 2007, heard Respondents' motions for summary judgment and, on December 17, 2007, granted summary judgment in their favor. The Circuit Court determined that Respondents were not subject to liability as employers for the negligent acts that contributed to Mr.

Appiah's death because Respondents did not retain sufficient control over the work of the independent contractors whose negligence caused the accident. In reaching that determination, the court relied in part on § 414 of the Restatement (Second) of Torts, which provides:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.[1]

The court also cited Comment c to that section of the Restatement, which explains that, under the principles set forth in § 414, an employer will only be liable for the negligent acts of an independent contractor "if the employer [has] retained at least some degree of control over the manner in which the work is done." The court noted that Comment c further explains that the control retained must entail more than "a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations ... or to prescribe alterations and deviations" and that the employer's supervision must be such "that the contractor is not entirely free to do the work in his own way."

The Circuit Court then looked to Maryland cases interpreting and applying this principle. The court determined that an employer will not be liable in Maryland for the negligence of an independent contractor unless the employer had control over the details of the contractor's work, specifically the "very thing from which the injury arose." (Internal quotation marks and citation omitted). Rejecting Petitioners' argument that Respondent P & O's contractual safety responsibilities and the terms of Respondent MPA's lease agreement with Marine Repair requiring certain accident protocol constituted

---

1. Unless otherwise noted, all subsequent citations to § 414 and to the Restatement refer to that section of the Restatement (Second) of Torts (1965).

control over the details of the independent contractors' work, the court determined that Petitioners failed "to offer any evidence that MPA or P & O had control over the methods, techniques, or sequences of the specific work performed by Marine Repair Services or Den–El." The court further found that the "evidence show[ed] that ... P & O had no control over the actions of independent contractors such as Marine Repair Services" and, even if Respondents exercised control over safety at Seagirt, Petitioners offered "no evidence that the MPA or P & O controlled the very thing which caused the injury to Mr. Appiah." Because the court determined that the evidence did not support Petitioners' claims against Respondents and granted summary judgment on that basis, the court did not address the statute of limitations issue.

Petitioners timely noted appeals to the Court of Special Appeals.[2] The Court of Special Appeals affirmed the judg-

---

2. Petitioners Ms. Appiah and Ms. Agyarko noted their appeals on January 16, 2008 and January 25, 2008, respectively. By that time, Petitioners had voluntarily dismissed their claims against defendants Shapiro and WWL. With regard to defendants Mr. Hall and Den–El, however, the record discloses the following.

During the Spring of 2007, Mr. Hall and Den–El offered to settle with Petitioners pending a review of Den–El's financial records. Petitioners subsequently accepted the terms of the offered settlement. Then, on September 18, 2007, Respondent P & O filed an amended cross-claim seeking indemnification solely from Den–El. Because of this pending cross-claim, Mr. Hall and Den–El refused to comply with the terms of the settlement agreement.

Consequently, on October 12, 2007, Petitioners filed a motion to enforce that agreement. On November 28, 2007, the Circuit Court granted that motion and issued an order to enforce the settlement agreement as well as an order dismissing P & O's cross-claim against Den–El. On December 7, 2007, Petitioners filed a motion to vacate the order to enforce the settlement agreement on the ground that the settlement agreement could jeopardize Petitioners' right to federal death benefits. The court held a hearing on the motion and, on January 7, 2008, denied that motion. Mr. Hall and Den–El filed a stipulation of dismissal on September 24, 2008, the date the case file was closed in the Circuit Court.

Before the Court of Special Appeals, Respondents argued that Petitioners' appeals were premature because they were filed before disposition of Petitioners' case against Mr. Hall and Den–El. The Court of Special Appeals declared that, though Petitioners' claims against Mr. Hall and Den–El had not been resolved at the time the appeal was

ment of the Circuit Court. *Appiah v. Hall,* 183 Md.App. 606, 612, 962 A.2d 1046, 1049 (2008).

On appeal to that court, Petitioners argued that the Circuit Court erred when it determined that Petitioners presented insufficient evidence that Respondents had retained sufficient control to subject them to liability under the principles outlined in § 414. *Id.* at 611, 962 A.2d 1046, 1049 (2008). Petitioners further argued that the Circuit Court's grant of summary judgment in Respondents' favor was in error because that judgment disregarded disputed material facts. *Id.,* 962 A.2d at 1049. In turn, Respondents argued that the Circuit Court did not err when it granted summary judgment in their favor and, further, that the Court of Special Appeals should determine whether Petitioners' claims were time-barred under the Maryland Wrongful Death Act. *Id.,* 962 A.2d at 1049.

The Court of Special Appeals concluded that Respondents could not be held liable under § 414 because Petitioners failed to provide any evidence that Respondents had retained sufficient control of the specific work that caused Mr. Appiah's death. *Id.* at 621–22, 962 A.2d at 1054–55. The Court of Special Appeals rejected Petitioners' argument that, as a landowner, the MPA had a non-delegable duty to ensure the safe operation of Seagirt, the non-performance of which would subject the MPA to liability. *Id.* at 628–30, 962 A.2d at 1058–59. The court determined that the duties arising out of the MPA's landowner status only obligated the MPA to ensure the safety of invitees with respect to dangerous conditions on the property and, because Mr. Appiah's injuries were caused by work performed by independent contractors rather than a dangerous condition, the MPA could not be held liable as a landowner. *Id.,* 962 A.2d at 1059. The court further determined that Respondents could not be liable except as employ-

---

noted, because Petitioners subsequently dismissed those claims, "the only issue remaining on appeal" was the Circuit Court's grant of summary judgment. 183 Md.App. at 618, 962 A.2d at 1052–53. Therefore, the Court of Special Appeals declared the judgment final pursuant to Maryland Rule 8–602(e). *Id.* at 619, 962 A.2d at 1053.

ers as contemplated by § 414 and only if they "retained sufficient control over the act of connecting shipping containers to trucks," which the court concluded was "the thing out of which the very injury arose." *Id.* at 622, 962 A.2d at 1055 (internal quotation marks omitted).

In reaching the conclusion that Petitioners failed to provide any evidence that Respondents retained sufficient control over the "methods of performing the specific injurious act" such that liability could attach, the Court of Special Appeals relied on *Wajer v. Balt. Gas & Electric Co.,* 157 Md.App. 228, 850 A.2d 394 (2004). That case establishes that, for a plaintiff to prove that a defendant employer retained sufficient control under § 414 such that liability attached, the plaintiff must show that the employer reserved the " 'right to control [the] operative detail or manner in which the independent contractors performed their work' " and that the " 'independent contractors were not free to choose the methods, techniques, or sequences of the work to be performed.' " *Appiah,* 183 Md. App. at 632, 962 A.2d at 1060 (quoting *Wajer,* 157 Md.App. at 244, 850 A.2d at 394).

In response to Petitioners' argument that Respondent P & O was responsible for ensuring safety at Seagirt and could inspect and recommend changes if P & O employees witnessed unsafe practices, the Court of Special Appeals determined that nothing in the record demonstrated that P & O retained control over the attachment of reefers to trucks such that "the contractor is not entirely free to do the work in his [or her] own way." *Id.* at 635, 962 A.2d at 1062 (internal quotation marks omitted). Likewise, the court rejected Petitioners' contention that the MPA's authority to restrict the "advertising matter, symbols, canopies, or awnings" displayed on the premises constituted control over "the connecting of a shipping container to a truck." *Id.* at 628, 635–36, 962 A.2d at 1058, 1062–63. As such, the Court of Special Appeals affirmed the judgment of the Circuit Court on the ground that Petitioners failed to establish a dispute of material fact concerning

whether Respondents retained sufficient control over the attachment of containers to trucks to trigger liability under § 414.[3]

On February 9, 2009, Petitioners filed with this Court a petition for certiorari, which we granted, *Appiah v. Hall*, 408 Md. 148, 968 A.2d 1064 (2009), to consider the following questions: [4]

**3.** On appeal to the Court of Special Appeals, Respondents argued that summary judgment was appropriate not only because Petitioners failed to establish that Respondents retained sufficient control under § 414 to impose liability, but also because Petitioners failed to establish a dispute of material fact related to whether Respondents' relationship to Marine Repair was such that Respondents had entrusted any work to them and could retain control over the details of that work. *Id.* at 636–40, 962 A.2d at 1063–65. The Court of Special Appeals acknowledged these arguments but did not address them on the merits because the trial court granted summary judgment in Respondents' favor on the basis that Petitioners provided no evidence that Respondents retained control over the details of the work that caused Mr. Appiah's death. *Id.* at 640, 962 A.2d at 1065.

The Court of Special Appeals also briefly considered Respondents' argument that the third amended complaint was time-barred because "it asserted new facts that did not 'relate back' to the filing of the original complaint." *Id.* at 640, 962 A.2d at 1065. The court recognized that generally a statute of limitations challenge should be addressed prior to any proceedings on the merits because compliance with the applicable statute of limitations in an action "is a condition precedent to the right to maintain that action." The court concluded, though, that the trial court had correctly determined that the issue was moot. *Id.* at 644, 962 A.2d at 1067. Thus, the Court of Special Appeals declined to address the merits of Respondents' statute-of-limitations arguments and affirmed the grant of summary judgment on "the grounds relied upon by the trial court." *Id.* at 645–46, 962 A.2d at 1068.

**4.** P & O's brief presents a question not presented in the petition for certiorari: "Whether P & O Ports is entitled to summary judgment in its favor on the alternative grounds that Petitioners' Third Amended Complaint against P & O Ports was time-barred, when the Third Amended Complaint alleged new operative facts against P & O Ports more than four years after Mr. Appiah's accident." We decline to consider this question. *See* Maryland Rule 8–131(b); *Clark v. Elza*, 286 Md. 208, 219 n. 4, 406 A.2d 922, 928 n. 4 (1979) (declining to consider an issue not raised in either the petition or a cross-petition for certiorari). In any event, we need not address this question because we affirm the Circuit Court on the same grounds upon which that court based its decision.

1. Whether the Circuit Court for Baltimore City improperly granted and the Court of Special Appeals erroneously affirmed summary judgment despite disputed issues of material facts in derogation of proper conceptualization, interpretation and application of the summary judgment rule?

2. Whether the award of summary judgment rests on an errant interpretation of the 'Right to Control' required for liability under Restatement (Second) of Torts, § 414?

## II.

When considering an appeal from an order granting summary judgment, our review begins with the determination whether a genuine dispute of material fact exists; only in the absence of such a dispute will we review questions of law. *O'Connor v. Balt. County*, 382 Md. 102, 110, 854 A.2d 1191, 1196 (2004). "A trial court may grant summary judgment when there is no genuine dispute of material fact and a party is entitled to judgment as a matter of law." *120 W. Fayette St., LLLP v. Mayor & City Council of Balt. City*, 413 Md. 309, 329, 992 A.2d 459, 471 (2010) (internal quotation marks and citation omitted). We review for legal correctness a trial court's application of this standard. *Id.*, 992 A.2d at 471.

When reviewing the record to determine whether a genuine dispute of material fact exists, "[w]e construe the facts properly before the court, and any reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party." *O'Connor*, 382 Md. at 111, 854 A.2d at 1196. To avoid summary judgment, however, the non-moving party must present more than general allegations; the non-moving party must provide detailed and precise facts that are admissible in evidence. *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737–38, 625 A.2d 1005, 1011 (1993). Merely proving the existence of a factual dispute is not necessarily fatal to a summary judgment motion. *O'Connor*, 382 Md. at 111, 854 A.2d at 1196. " '[A] dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a material fact and such dispute does not

prevent the entry of summary judgment.'" *Id.*, 854 A.2d at 1196 (quoting *Lippert v. Jung*, 366 Md. 221, 227, 783 A.2d 206, 209 (2001)). So long as the record reveals no genuine dispute of any material fact "necessary to resolve the controversy as a matter of law, and it is shown that the movant is entitled to judgment, the entry of summary judgment is proper." *Id.*, 854 A.2d at 1197 (internal quotation marks and citation omitted).

Petitioners argue that whether Respondents retained sufficient control to subject them to liability is a question that "demands jury resolution, not judicial fiat." Specifically, Petitioners contend that a question exists related to whether Marine Repair developed its safety protocol before or after the accident involving Mr. Appiah and that factual dispute is material to whether Respondents retained sufficient control to be subject to liability under the control retention doctrine of § 414. Petitioners further contend that a dispute of material fact exists concerning whether Respondents conducted post-accident investigations, which, Petitioners argue, is relevant to the issue of control because the authority to investigate an accident demonstrates control over "the very thing that caused the Appiah accident." Likewise, Petitioners argue that, when the Court of Special Appeals determined that "[Petitioners] provided no ... instances whereby P & O dictated to Marine Repair how to conduct its operations," the court erroneously ignored Petitioners' contention that Marine Repair had to obtain permission from Respondents before implementing a safety protocol and this requirement demonstrates that Respondents retained control over the very thing that caused the accident. Petitioners also argue that Respondent P & O's control over the activities at Seagirt was demonstrated by P & O's contractual duty to "continuously inspect ... for hazards or unsafe acts ... and [exercise] full authority to correct them."

Respondents agree that whether Marine Repair had a safety protocol in place before the accident is disputed. They argue, though, that the dispute is not material to the issue of control. Further, Respondents do not dispute that the Mary-

land Department of Transportation Police investigated the accident. Respondents maintain, however, that the investigation is irrelevant to the question of whether Respondents retained control over the details of the work that caused the accident. Respondents also argue that nothing in the record supports Petitioners' assertion that Marine Repair needed Respondents' permission to implement a safety protocol; instead, the record merely shows that Marine Repair needs permission to post signs or make other exterior alterations. With regard to P & O's general safety responsibilities, Respondents argue that, even assuming that P & O has a duty to impose general safety restrictions on the independent contractors at Seagirt, a general duty "does not establish the type of control contemplated by § 414."

P & O contends, moreover, that any "evidence" Petitioners identify as establishing P & O's contractual duty to impose safety regulations at Seagirt is the product of misrepresentation. P & O rests this contention on Petitioners' reliance on P & O's response to the MPA's Request for Proposals ("RFP") as evidence of a contractual duty to insure safe operations at Seagirt. P & O points out that the RFP response was generated when P & O submitted a proposal to provide stevedore services at Seagirt and the relevant portion of that agreement refers to P & O's safety history and safety programs as related to the company's operations. P & O also contends that P & O only had responsibility over its terminal operation services at Reefer Row and did not have the authority to impose safety rules within the area. To the extent that P & O could impose safety regulations at Seagirt, P & O argues that the scope of that authority was limited to assistance with the enforcement of traffic rules and other general safety measures, not the specific daily activities of each independent contractor operating on the premises.

### III.

Petitioners raise numerous arguments in support of their contention that there are disputes of material facts concerning whether Respondents retained control of the work that caused the accident. For the reasons that follow, none of

those arguments persuades us that the Circuit Court wrongly determined that Petitioners produced insufficient evidence to generate a genuine dispute of material fact relevant to the issue of Respondents' retention of control.

First, Petitioners insist that whether Marine Repair developed its safety protocol before the accident is a disputed material fact. Although that fact is disputed, it is not material to the issue of control. Petitioners are attempting to collect damages from the MPA and P & O. Whether Marine Repair had in place a safety protocol is unrelated to whether either Respondent controlled the very thing that caused the accident at issue in this case. Nowhere do Petitioners allege that such a safety protocol would have been developed at the behest of Respondents or even in compliance with the terms of any agreement Marine Repair had with the MPA. As such, we cannot reasonably conclude that resolution of this factual dispute would in any way influence the determination of a trier of fact as to whether Respondents retained control over the activities related to the accident.

Second, Petitioners allege that there is a genuine dispute of material fact concerning whether Respondents conducted post-accident investigations. Petitioners argue that this factual dispute must be settled to determine the amount of control retained by Respondents. To support their allegation that Respondents conducted independent post-accident investigations, Petitioners point to deposition testimony indicating that an expert investigating the accident spoke to representatives of the MPA and P & O who stated that "their accident investigations were in progress." In that same deposition, the deponent indicates that MPA representatives referred him to MPA police to obtain the results of the investigation and that P & O indicated that it could not release the results of its investigation. Although it may be reasonable to infer from these facts that the MPA and P & O conducted post-accident investigations independent of any investigation by the Maryland Department of Transportation Police, we are unable to see how this dispute is relevant to the issue of Respondents' retention of control over the work performed by Marine

Repair. The mere fact that the MPA investigated an accident that took place on its property, without more, does not imply that the MPA controlled the work of the independent contractors involved. Petitioners allege no facts that indicate that such an investigation was, for example, in response to a breach of the MPA's safety mandates or part of the MPA's effort to control the details of the work of the independent contractors at Seagirt. Likewise, Petitioners' contention that P & O conducted an investigation of the accident, without more, has no nexus to the issue of P & O's control over the work of the independent contractors at Seagirt. Nothing in the record indicates that the alleged investigation was anything more than an effort to determine what events caused Mr. Appiah's death. Therefore, we conclude that this alleged factual dispute is immaterial to the issue of control.

Third, Petitioners argue that Marine Repair was required to obtain Respondents' permission before implementing a post-accident safety protocol related to "the very thing that caused the accident." To support this allegation, Petitioners cite to the Lease Agreement between Marine Repair and the MPA, which provides, under a section titled "Signage," that "[n]o signs or other advertising matter, symbols, canopies or awnings ("Advertising Matter") shall be attached to or painted on or within the [leased container slots], including the windows and doors thereof, without the prior written consent of MPA, which consent shall not be unreasonably withheld." Additionally, Petitioners cite to a deposition of Marine Repair's corporate designee in which that deponent stated that, "[i]f Marine Repair wanted to ... post a sign for truckers in the reefer row area," it "would have to get permission" from the MPA and P & O. Respondents rightly point out that a requirement that Marine Repair obtain permission from Respondents prior to posting signage on the leased premises is a far cry from a requirement that Marine Repair obtain Respondents' permission before "imposing a post-accident safety protocol." [5] Giv-

---

5. A scrupulous review of the record reveals no indicia of any such requirement. Petitioners' assertions to the contrary exaggerate the evidence in the record.

en Petitioners' unreasonable interpretation of the facts, we conclude that they have failed to establish a genuine dispute of material fact concerning whether Marine Repair was required to obtain Respondents' permission before implementing a post-accident safety protocol. *See Beatty,* 330 Md. at 739, 625 A.2d at 1011 ("[W]hile a court must resolve all inferences in favor of the party opposing summary judgment, [t]hose inferences ... must be reasonable ones." (internal quotation marks and citation omitted)).

Lastly, Petitioners contend that there exists a genuine dispute of material fact concerning whether P & O had a contractual duty to "continuously inspect for hazards/unsafe acts, and to exercise 'full authority to correct' such hazards, including the very thing that caused the accident." To support their allegation that P & O indeed had such a duty, Petitioners refer to the Circuit Court's observation in its memorandum opinion that "P & O was responsible for seeing that Seagirt was operating efficiently and safely." Given that the Circuit Court found that Petitioners "failed to offer any evidence that MPA or P & O had control over the methods, techniques, or sequences of the specific work performed by Marine Repair Services or Den–El," we infer that the Circuit Court did not find the above-referenced duty to see that Seagirt was operating efficiently and safely to be material to the retention of control issue. Moreover, the Circuit Court undermined any contention that P & O's general duty to ensure efficient and safe operations at Seagirt constituted "control over safety" when it expressly assumed *for the sake of argument* that P & O had such control before explaining why the exercise of control over safety was insufficient to establish the retention of control requisite for liability under § 414.

Additionally, Petitioners refer us to the first page of P & O's contract with the MPA. That page effectively indicates that P & O is a contractor for the MPA and that P & O will "operate and administer the gate and landside terminal operations as well as service the Intermodal Container Transfer Facility. ... These operations will include but not be limited to processing of steamship equipment (containers/chassis) at the

Seagirt Marine Terminal ... and performing stevedore opera-
tions[.]" The contract also incorporates the "terms, condi-
tions, and provisions" of additional contract documents, which
are attached to the signature document containing this first
page.

Although not explicitly stated in their briefs, we gather that,
from these contractual provisions, Petitioners infer that por-
tions of P & O's response to the MPA's RFP attached to the
contract constitute "terms, conditions, and provisions" of the
contract. Petitioners rely heavily on the portion of P & O's
RFP that appears under the heading "Describe your compa-
ny's safety and claims handling, practices and procedures
(both property damage and personal injury)." The response
is an outline of P & O's safety record and protocols. It states
the following: "[s]afety and insurance are keynote areas for
any quality stevedore/terminal operator"; the company has a
long history of "being on the forefront of Safety and Claims
administration"; P & O's employees have the right to a safe
workplace; P & O works with the union and individual P & O
employees to instill that safety is a priority and ensures the
"welfare of [P & O's] employees"; P & O employs a full-time
safety director; P & O has implemented safety standards of
OSHA and the U.S. Coast Guard in an effort to "anticipate
hazards and human error and control them through planning";
and P & O "utilize[s] five types of inspections to safeguard [P
& O's] employees and operations." With reference to inspec-
tions, the response provides that P & O periodically inspects
its "sheds, shops, gear area and other continuous operations,"
sends the safety director to inspect intermittently the work of
P & O's supervisory personnel, imposes on P & O's superviso-
ry personnel an obligation "to continuously inspect their
changing work sites for hazards or unsafe acts as they occur
and have full authority to correct them," requires inspections
every time P & O employees "start a new piece of equipment,"
and submits to independent audits from an outside safety
audit company.

P & O's safety standards and its inspection policy refer
repeatedly to P & O employees, P & O's work areas, and P &

O's work practices. Nowhere in the description of P & O's safety and claim handling procedures does P & O allude to supervising the safety of other independent contractors working in the same port or suggest that its policies apply to contractors other than P & O. Moreover, these attestations of P & O's commitment to and its history of safe operations in no way amount to "terms, conditions, [or] provisions" imposing a contractual obligation to "continuously inspect for hazards/unsafe acts" created or performed by other independent contractors or to correct any such hazards. At most P & O has warranted to the MPA that these policies exist and apply to P & O operations. The contract in no way indicates that P & O has the authority or responsibility to impose these policies on other contractors at Seagirt. Thus a finder of fact could not reasonably conclude that a genuine dispute of material fact exists concerning whether P & O had a contractual obligation to "continuously inspect for hazards/unsafe acts" created or performed by other independent contractors or to correct any such hazards.

Even assuming *arguendo* that P & O has a contractual obligation to inspect Seagirt for hazards or unsafe acts created by the work of other independent contractors, nothing in the record indicates that such an obligation would enable P & O to direct the work performed, or the safety policies adopted, by other independent contractors at Seagirt.[6] Indeed, the evi-

---

6. Again, Petitioners mischaracterize the evidence in the record. Petitioners take out of context and exaggerate the meaning of the facts relied upon to demonstrate P & O's alleged contractual obligation to ensure that the other independent contractors at Seagirt conduct their work safely.

We also note that our assessment of the facts related to this issue would have been facilitated greatly by the inclusion of the entire contract, including all attachments, in the record. At the very least, the parties should have included all of the documents comprising the portion of the contract entitled "Portions of the Contractor's Technical Response to the Administration's Request for Proposals," rather than a few pages. To discern out of context the import of the few documents provided is not only difficult but undesirable in light of the procedural posture of this case and the issues presented to this Court. Regardless, as mentioned, the available documents do not permit a reasonable

dence in the record is to the contrary. P & O's corporate designee testified that P & O had no authority to direct the work of the employees of other independent contractors or of the companies themselves and if a P & O employee were to attempt to correct the work of another contractor at Seagirt, that contractor would object. As such, again assuming *arguendo* that Petitioners have alleged sufficient facts to create a dispute of fact related to P & O's obligation to ensure safety at Seagirt, this dispute is immaterial to whether Respondents, particularly P & O, retained sufficient control over the work performed by the other independent contractors at Seagirt to impose liability under the control retention doctrine described in § 414. Accordingly, we agree with the Circuit Court's conclusion that Petitioners failed to establish a genuine dispute of any material fact "necessary to resolve the controversy."

## IV.

We now consider whether Respondents were entitled to judgment as a matter of law. *O'Connor,* 382 Md. at 111, 854 A.2d at 1197.

Petitioners argue that P & O owed a duty of reasonable care to Mr. Appiah by virtue of P & O's contract with the MPA. Petitioners also argue in their briefs to this Court that, under § 6–211 of the Maryland Transportation Article, the MPA "owed a nondelegable statutory duty to regulate the safe movement of trucks at Seagirt." [7] Additionally, Petitioners

---

inference in favor of Petitioners and, furthermore, do not create a genuine dispute of material fact relevant to Petitioners' argument that Respondents retained control over the work of the independent contractors whose activities caused Mr. Appiah's accident.

7. Maryland Code (2001, 2008 Repl. Vol.), § 6–211, entitled "Control of motor vehicles at port facilities," provides, in relevant part:

 (a) *Adoption of regulations.*—The [Maryland Port] Commission may adopt and enforce regulations for the parking and operation of motor vehicles in and on its port facilities.

 (b) *Scope of regulations.*—The regulations shall:

contend that both Respondents "owed a common law duty" to Mr. Appiah as a business invitee and Respondents breached that duty by failing to implement "an appropriate safety protocol to prevent the truck's movement while the reefer mechanic worked immediately to the rear of the truck." Petitioners assert that the MPA's duty, in part, stems from the lease agreement between the MPA and Marine Repair by virtue of which Marine Repair became an independent contractor of the MPA. To support this assertion, Petitioners cite Section 43 of the lease agreement, entitled "Customer Service," which provides:

Marine Repair shall provide its customers in the Port of Baltimore with terminal services which meet or exceed the top quality standards recognized in the industry. If MPA receives legitimate complaints from customers about the quality of Marine Repair's services, Marine Repair will provide a representative to meet jointly with MPA and the affected customer to resolve the issue at hand.... If a pattern of repeated valid complaints about Marine Repair's services develops and these complaints are not resolved to the customer's or MPA's satisfaction, Marine Repair shall be in default and MPA may avail itself of all rights and remedies allowed to it under this Lease.

With respect to whether Respondents retained control over safety at Seagirt, Petitioners argue that Respondent P & O's purported contractual obligation to conduct continuous inspections for hazards and unsafe acts and the corresponding

---

(1) Be reasonably necessary for the safety of persons and property or for the efficient operation of the port facilities;

(2) Provide for a uniform system for accessible parking for individuals with disabilities to enhance the safety of people with disabilities in conformity with the "Uniform System for Parking for Persons with Disabilities" (23 C.F.R. Part 1235) and the "Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities" (Appendix A to 28 C.F.R. Part 36 and 36 C.F.R. Part 1191.1); and

(3) Include procedures for the voluntary payment of fines directly to the Administration in uncontested parking cases.

(c) *Transportation Authority police may issue citations.*—The Maryland Transportation Authority Police Force may issue citations for violations of the motor vehicle regulations adopted under this section.

authority to correct such hazards, as well as P & O's purported authority to ban unsafe truck drivers from Seagirt, demonstrate that P & O retained "plenary control over operative detail concerning safety on Reefer Row."[8] With respect to Respondent MPA, Petitioners contend that the MPA exercised the requisite control over safety at Reefer Row by virtue of their lease agreement. Petitioners point to section 15(j) of the MPA's lease agreement with Marine Repair, which provides that, "[i]n the event of any injury or damage to persons or property, Marine Repair shall immediately notify MPA verbally and in writing, providing pertinent information to enable MPA to adopt whatever measures may be necessary to prevent further losses."

Respondents object to Petitioners' contention that either the MPA or P & O entrusted any work to Marine Repair as an independent contractor. Respondents argue that entrustment is a prerequisite to any finding of an independent contractor relationship upon which liability may be premised under the retention of control doctrine. Specifically, the MPA contends that the lease agreement did not cause Marine Repair to perform any work, and P & O contends that it had no contract whatsoever with Marine Repair. Alternatively, Respondents argue that, even if Petitioners had alleged sufficient facts to establish an independent contractor relationship between Respondents and Marine Repair, Respondents did not have control over the operative details of Marine Repair's work and therefore are not liable under the retention of control doctrine explicated in § 414. Respondents argue that, to impose liability for Marine Repair's negligence, Respondents must have retained more than a " 'general right to order the work stopped or resumed, to inspect its progress or to review reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations or deviations.' " (Quoting § 414 cmt. c). Moreover, Respondents

---

**8.** We have already established that such a construction of P & O's contract with the MPA is unreasonable and, moreover, that any duty to inspect for hazards or unsafe acts is irrelevant to the retention of control issue.

argue that, as determined by the Circuit Court and the Court of Special Appeals, they are not liable for Marine Repair's negligence unless they exercised control over " 'the very thing from which the injury arose.' " (Quoting *Wajer*, 157 Md.App. at 242, 850 A.2d at 402). Respondents argue that the very thing from which Mr. Appiah's injury arose was Marine Repair's truck loading operation and that Petitioners produced no evidence that Respondents controlled any aspect of that process.

## A.

■ Before addressing the legal basis upon which liability may be imposed on employers for harm caused by the negligence of independent contractors, we dispose of Respondents' contention that Petitioners have failed to establish an independent contractor relationship because Respondents neither entered into a contract for work nor entrusted any work to Marine Repair. Respondents argued to the Circuit Court and the Court of Special Appeals that Petitioners failed to present evidence proving an independent contractor relationship, but neither court addressed the issue. *Appiah*, 183 Md.App. at 640, 962 A.2d at 1065 ("The trial court did not base its decision on the theory of an entrustment, *vel non*, arising out of an independent contractor relationship between the parties. We, therefore, decline to address the issue of entrustment on its merits."). "Ordinarily, an appellate court should review a grant of summary judgment only on the grounds relied upon by the trial court." *Blades v. Woods*, 338 Md. 475, 478, 659 A.2d 872, 873 (1995). As did the Court of Special Appeals, we decline to address the merits of Respondents' contentions on the issue of entrustment.

To provide guidance to courts addressing similar issues in the future, however, we point out that the Restatement recognizes two types of independent contractor relationships: (1) a relationship in which an individual does work for another gratuitously under terms insufficient to render the relationship a master-servant relationship; and (2) a relationship in which an individual contracts to do work for another for pay.

*See* § 409 cmt. a. Similarly, for the purpose of determining the availability of Workers' Compensation benefits, we have defined an independent contractor "as one who contracts to perform a certain work for another according to his own means and methods, free from the control of his employer in all details connected with the performance of the work, except as to its product or result." *Inner Harbor Warehouse, Inc. v. Myers*, 321 Md. 363, 369 n. 3, 582 A.2d 1244, 1247 n. 3 (1990) (internal quotation marks and citation omitted). We need not determine now which definition of an independent contractor relationship, if any, controls in this context. Suffice it to say that, though these definitions contrast in origin, they share one overriding characteristic: the relationship is created when one performs work *for another.* From this common trait we may easily draw the conclusion that to prove an independent contractor relationship the evidence must demonstrate, at the very least, that the putative independent contractor has agreed to perform work for another.

Our discussion on this point is intended to clarify that an independent contractor relationship exists only under certain circumstances. As mentioned, because our review is limited to the grounds relied upon by the trial court, we should not, and will not, consider whether Petitioners have met this burden and assume that it has been satisfied for the purposes of our analysis. Bearing this assumption in mind, we now turn to the merits of the parties' remaining contentions.

## B.

Generally, an "employer of an independent contractor is not liable for the negligence of the contractor or his employees." *Rowley v. Balt.*, 305 Md. 456, 461, 505 A.2d 494, 496 (1986). This common law principle is embodied in § 409 of the Restatement, which provides that, with some exceptions, "the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." Although the exceptions to this rule are numerous, Comment b to § 409 of the Restatement explains that they generally "fall into three very broad

categories: 1. Negligence of the employer in selecting, instructing, or supervising the contractor[;] 2. Non-delegable duties of the employer, arising out of some relation toward the public or the particular plaintiff[; and] 3. Work which is specially, peculiarly, or 'inherently' dangerous." Under these exceptions, liability is imposed on the employer of an independent contractor under one of two theories: vicarious liability or "actual fault on the part of an employer." *Rowley*, 305 Md. at 462, 505 A.2d at 497; Restatement §§ 410–415 introductory n. (discussing liability for harm caused by employers of independent contractors).

### Vicarious Liability

■■■ Petitioners' theory that Respondents are liable for the breach of a nondelegable duty rests on a theory of vicarious liability. *See* Restatement §§ 416–429 introductory n. (explaining that employers of independent contractors may be liable for harm caused by the work of an independent contractor, irrespective of the employer's actual fault, "in situations in which, for reasons of policy, the employer is not permitted to shift the responsibility for the proper conduct of work to the contractor[ ]"). "Such a 'non-delegable' duty requires the person upon whom it is imposed to answer for it that care is exercised by anyone, even though he be an independent contractor, to whom the performance of the duty is entrusted." *Id.* Sections 416 to 429 of the Restatement explain various circumstances under which an employer of an independent contractor assumes a nondelegable duty and may be subject to vicarious liability. Petitioners' allegations most closely resemble the theory of liability expressed in § 424, which imposes liability on employers who are under a statutory duty "to provide specified safeguards or precautions for the safety of others,"[9] and liability based on Respondents' status

---

9. Section 424 provides:
 One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is

as possessors or occupiers of land, which may be grounded in any of several Restatement sections addressed below. We shall address each of Petitioners' theories of liability in turn.

First, though Petitioners argued to the Circuit Court that the MPA had a nondelegable duty arising out of "the MPA's ownership and occupation of the Seagirt Marine Terminal," Petitioners did not argue at that time that this duty arose from any statutory obligation. Therefore we decline to consider such an argument at this juncture. *See* Maryland Rule 8–131(a).

Second, Petitioners contend that Respondents are subject to a nondelegable duty, arising out of their status as possessors or occupiers of land, to maintain Seagirt in a "reasonably safe condition." *See Rowley,* 305 Md. at 463, 505 A.2d at 497. Such a duty would stem both from Respondents' alleged status as employers of independent contractors and their status as possessors of the property in question. *See id.* at 464, 505 A.2d at 498 (citing § 328(a), which defines a possessor of land as "a person who is in occupation of the land with intent to control it"); *see also* § 383 (explaining that "[o]ne who does an act or carries on an activity upon land on behalf of the possessor is subject to the same liability, and enjoys the same freedom from liability, for physical harm caused thereby to others"). As we recognized in *Rowley,* "[t]he standard of care owed by a possessor of land depends upon the status of the person on the land; *i.e.,* whether he is an invitee, a licensee, or trespasser." 305 Md. at 464, 505 A.2d at 498. "An invitee is a person invited or permitted to enter or remain on another's property for purposes connected with or related to the owner's business." *Id.* at 465, 505 A.2d at 498. The nondelegable duty owed by possessors of land to invitees is expressed in the Restatement under § 343, which provides:

imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions.

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.

In *Rowley*, we described the duty imposed on employers under § 343 as a duty to "use reasonable and ordinary care to keep [the] premises safe for the invitee[s] and to protect [them] from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for his own safety will not discover." 305 Md. at 465, 505 A.2d at 498.

 When applied to employers of independent contractors, this duty is referred to as the "safe workplace" doctrine, under which "one who employs an independent contractor has a duty to provide a safe workplace for the employees of the contractor."[10] *Id.,* 505 A.2d at 498. The liability imposed on employer-possessors under this doctrine, however, rests on the assumption that the harm in question was caused by a condition on the property, not operative detail of the work of the independent contractors. *See Rowley,* 305 Md. at 466–67, 505 A.2d at 499 (citing § 425, which provides that an employer of an independent contractor hired "to maintain in safe condition land which he holds open to the entry of the public as his

---

**10.** In *Rowley,* we held that, when an independent contractor assumes "responsibility for maintenance and repairs, and the harm has occurred to the contractor or his employee as a result of a defect arising from the failure of the contractor to make those repairs, nothing in §§ 416–429 operates to impose liability upon the person who hired the contractor." 305 Md. at 474, 505 A.2d at 503. In reaching that holding, we questioned whether the aforementioned nondelegable duties apply at all to the employees of independent contractors but did not attempt to resolve that broad question. *See id.* at 467–74, 505 A.2d at 499–503. Because Petitioners' allegations satisfy none of the various theories of vicarious liability under which Respondents could be held liable for the breach of a putative nondelegable duty, we need not decide in this case whether the employees of independent contractors are owed such a duty and our views expressed in *Rowley* remain undisturbed.

place of business ... is subject to the same liability for physical harm *caused by the contractor's negligent failure to maintain the land* ... in reasonably safe condition, as though he had retained its maintenance in his own hands"; § 422, which provides that a possessor who entrusts work on the land to an independent contractor "is subject to the same liability as though he had retained the work in his own hands ... *for physical harm caused to [others on or outside the land] by the unsafe condition of the structure* "; § 418, which imposes liability for harm caused in "any place which is maintained by the government for the use of the public if the government is under the same duty to maintain it in reasonably safe condition as it owes to the public in respect to the condition of its highways" (emphasis added)). Because Mr. Appiah sustained his injuries while participating in Marine Repair's work at Seagirt, not from a condition on the property, none of these duties would apply.

Moreover, we need not further belabor this issue because, as the Court of Special Appeals noted, *Appiah,* 183 Md.App. at 629, 962 A.2d at 1059, Petitioners abandoned in the Circuit Court any theory of liability based on Respondents' status as possessors and Mr. Appiah's status as a business invitee. During Petitioners' argument at the hearing on Respondents' motions for summary judgment, Petitioners were asked, "Are you abandoning your [Re]statement 343 argument?," and they replied, "We're not claiming under 343. It's 414 Your Honor." *Id.,* 962 A.2d at 1059. We agree with the Court of Special Appeals: Any argument that Respondents are liable for Mr. Appiah's injuries based on a duty arising solely out of their status as possessors of Seagirt is without merit and, furthermore, not properly before this Court. Having dispensed with the theories of vicarious liability upon which Petitioners might rely, we now consider whether Petitioners might rely on a theory of actual fault to impose liability on Respondents.

### Actual Fault

We have long recognized in Maryland that an employer is not liable for harm caused by the work of an

employee so long as "the employee is 'a contractor, pursuing an independent employment, and, by the terms of the contract, is free to exercise his own judgment and discretion as to the means and assistants that he may think proper to employ about the work, exclusive of the control and direction, in this respect, of the party for whom the work is being done.'" *Gallagher's Estate v. Battle*, 209 Md. 592, 601, 122 A.2d 93, 97 (1956) (quoting *Deford v. State ex rel. Keyser*, 30 Md. 179, 203 (1869)). When an employer has retained control of the details of the work, however, liability is permitted under a theory of actual fault. *See Gallagher's Estate*, 209 Md. at 601, 122 A.2d at 97 (explaining that an employer's liability under *respondeat superior* is predicated on the rationale that the employer's control over the employee's work renders the employer constructively present during the work, "so that the negligence of the servant is the negligence of the master"); Restatement §§ 410–429 introductory n. (referring to actual fault as the basis for imposing liability on employers under the retention of control doctrine set forth in § 414). Under this theory an employer is subject to liability for his failure "to exercise with reasonable care such control over the doing of the work as he retains to himself." *Id.* As this passage from the Restatement implies, and we have repeated throughout, the retention of control is an absolute prerequisite to an employer's liability for harm caused by the work of an independent contractor. *See Gallagher's Estate*, 209 Md. at 602, 122 A.2d at 98 ("[A] principal employing an agent to accomplish a result, but not having the right to control the details of his movements, is not responsible for incidental negligence while such agent is conducting the authorized transaction.").

■■■■■■ General control over an independent contractor's work, however, is insufficient to establish liability. As the Court of Special Appeals correctly stated, *Appiah*, 183 Md. App. at 621–22, 962 A.2d at 1055, and Comment c to § 414 provides, the retention of control doctrine only applies if:

[T]he employer [has] retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the

work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

We have characterized these principles as requiring plaintiffs to demonstrate that the employer not only has retained control over the operative detail and methods of the work but also that this control extends to *"the very thing from which the injury arose."* See Gallagher's Estate, 209 Md. at 602, 122 A.2d at 98 (internal quotation marks and citation omitted); *see also Wells v. General Electric Co.,* 807 F.Supp. 1202 (D.Md. 1992) (describing Maryland law as requiring that "the retention of control must exist in respect to the very thing from which the injury arose" (internal quotation marks and citation omitted)). The Court of Special Appeals concluded, and we agree, that the very thing from which the injury arose, and thus the very thing over which Respondents must have retained control for liability to attach, is Marine Repair's work connecting shipping containers to trucks. *See Appiah,* 183 Md.App. at 628, 962 A.2d at 1058. The accident in which Mr. Appiah sustained his injuries occurred during the process of connecting a reefer to a truck and no other activity could reasonably be alleged to have caused his death.

Petitioners' claims that P & O retained the right to ban dangerous truck drivers from the premises and to inspect for and remedy safety hazards at Seagirt in no way establish that P & O controlled the operative detail of Marine Repair's work or safety practices, especially as related to connecting shipping containers to trucks.[11] Assuming that P & O could

---

11. Petitioners rely here, as they did in the Court of Special Appeals, on *Wajer v. Baltimore Gas & Electric Co.* to support their position that they have produced sufficient evidence of Respondents' control over the

prohibit the entry of truck drivers who had been cited for unsafe driving at Seagirt, that authority does not translate into the authority to dictate the operative detail of Marine Repair's work or safety practices. Likewise, any authority P & O may have to inspect Seagirt for hazards and unsafe acts and to correct those problems does not support an inference that P & O may direct the operative details of Marine Repair's work. At most that authority would permit P & O to inspect Marine Repair's operations and "prescribe alterations and deviations." § 414 cmt. c. We repeat: "Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail." *Id.*

With regard to Petitioners' contentions related to the MPA, the lease agreement with Marine Repair establishes the MPA's right to be apprized of "any injury or damage to persons or property" and "to adopt whatever measures may be necessary to prevent further losses." Although these provisions grant the MPA the right to notice of injuries and potentially the right to "prescribe alterations and deviations," the Restatement explains that such rights do not necessarily constitute control over the operative detail of the work. *Id.* We are not persuaded that a contrary conclusion is warranted in this case. Given that Petitioners have failed to allege any facts demonstrating the requisite retention of control to impose liability on Respondents, we hold that Respondents are entitled to judgment as a matter of law.

## V.

In sum, because Petitioners failed to allege facts establishing a genuine dispute of material fact related to Respondents' control of Marine Repair's work connecting shipping contain-

---

connecting of shipping containers to trucks to be subject to liability. *See* 157 Md.App. 228, 850 A.2d 394. *Wajer* hardly supports Petitioners' cause. Indeed, Petitioners have produced less evidence of retention of control than did the unsuccessful plaintiffs in *Wajer. See id.* at 242–44, 850 A.2d at 402–04.

ers to trucks, the very thing from which Mr. Appiah's injury arose, the Circuit Court correctly granted summary judgment in favor of Respondents. Accordingly, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

HARRELL and MURPHY, JJ., Dissent.

MURPHY, J., dissenting, which HARRELL, J., joins.

I am persuaded that, while holding that the Respondents are entitled to summary judgment on the ground that they did not retain sufficient control over the work that resulted in Mr. Appiah's death, the Court of Special Appeals and the majority of this Court have interpreted too narrowly the words "the very thing from which the injury arose." It is true that in *Gallagher's Estate v. Battle,* 209 Md. 592, 122 A.2d 93 (1956), this Court stated that "the retention of control is an absolute prerequisite to an employer's liability for harm caused by the work of an independent contractor." In that case, (1) Gallagher, a "common carrier of freight," entered into a "trip lease" with the owners of a tractor trailer unit, one of whom—Mr. Steger—delivered a shipment of steel to Philadelphia, PA, and (2) on the return trip to Baltimore, Mr. Steger was involved in an accident that resulted in injuries for which he was held liable. "The sole question [presented in that case was] Gallagher's responsibility for Steger's negligence." *Id.* at 596, 122 A.2d at 95. The following evidence was uncontradicted:

> Steger[, who owned the trailer,] was paid by [the owner of the tractor], not by Gallagher. Steger testified without contradiction that he was not told by Gallagher the route by which he should transport the steel. He said: "You can use Route 1, Route 40, or whichever route you want to use. They never told you what route to use as long as you got the steel up there." He further said that when he was instructed to pick up a load at a certain time, he was told to deliver the load as fast as he could, within reason and safety. He was not told to deliver the load by a

certain time. There was no evidence that Gallagher had the power to control and direct Steger in the rendering of his services.

*Id.* at 603, 122 A.2d at 98.

While holding that Gallagher was not responsible for Steger's negligence *on the return trip to Baltimore,* this Court stated:

> **There is no doubt that, if the accident had occurred on the trip from Sparrows Point to Philadelphia,** for which trip the tractor trailer was leased and on which the I.C.C. placards were placed by Gallagher, **Gallagher would have been liable for Steger's negligence** in spite of the fact that [the owner of the tractor] agreed to save Gallagher harmless against bodily injury to other persons.

*Id.* at 598–99, 122 A.2d at 96. (Emphasis supplied). This statement would not have been included if the *Gallagher's Estate* Court interpreted the words "the very thing from which the injury arose" as narrowly as those words have been interpreted by the Court of Special Appeals and by the majority of this Court in the case at bar.

To determine whether either of the Respondents is entitled to summary judgment in the case at bar, it may be helpful to assume that, subsequent to the tragic accident, (1) MPA posted at each slot in Reefer Row a "safety protocol" that prohibited truck drivers from latching onto a reefer until they personally inspected the area between the truck and the reefer to confirm that the longshoreman had rolled up the power cord and moved out of harms way, or (2) P & O demanded that Marine Repair post such a protocol. Because summary judgment should not have been entered in favor of either Respondent if both of them had the contractual authority to take such action, their entitlement to summary judgment depends upon the answers to two questions: (1) Would Marine Repair have the legal right to remove a "safety protocol" posted by MPA? (2) Would Marine Repair have the legal right to refuse P & O's demand that such a protocol be posted? In my opinion, the correct answer to both questions is "no." I

would therefore reverse the judgment of the Court of Special Appeals, and direct that this case be remanded to the Circuit Court for trial.

Judge HARRELL has authorized me to state that he joins this dissenting opinion.