54 A.3d 714

**Barbara HASTINGS, et al.**

v.

**PNC BANK, NA.**

**No. 109, Sept. Term, 2011.**

Court of Appeals of Maryland.

Sept. 27, 2012.

Reconsideration Denied Nov. 15, 2012.

**6**

8

10

John H. Doud, III, Baltimore, MD, for petitioners.

Richard L. Lyon (Law Office of Richard L. Lyon, Bethesda, MD), on brief, for respondent.

Phoebe Papageorgiou, Mathew Street, American Bankers Association, Washington, DC, Brian L. Moffet, Gordon Feinblatt LLC, Baltimore, MD, for amicus curiae brief of American Bankers Association and Maryland Bankers Association in Support of Appellee PNC Bank, NA, Urging Affirmance.

William F. Brockman, Deputy Solicitor General, Douglas F. Gansler, Att'y Gen. of Maryland, Baltimore, MD, for amicus curiae brief of State of Maryland.

Argued before BELL, C.J., BATTAGLIA, GREENE, ADKINS, BARBERA, McDONALD, and IRMA S. RAKER (Retired, Specially Assigned), JJ.

Opinion by BARBERA, J.

Petitioners, Barbara Hastings, R. Cort Kirkwood, and Ann K. Robinson are beneficiaries of a testamentary trust who have sued the trustee, Respondent PNC Bank, NA (PNC). Petitioners allege that PNC improperly demanded that each beneficiary execute a broad release agreement prior to distribution and misapplied the provisions of the Maryland Code,

Tax–General Article,[1] in calculating the amount of inheritance tax owed on the trust's assets and the amount of commission to which PNC was entitled as trustee. The Circuit Court for Baltimore County granted summary judgment in PNC's favor, finding no legal impropriety in PNC's distribution plan or its calculation of the tax and commission. Petitioners appealed and the Court of Special Appeals affirmed the Circuit Court in an unreported opinion. We granted certiorari to decide whether PNC's actions are in accord with Maryland law and, for the reasons that follow, hold that they are. We therefore affirm.

## I.

In 1995, Marion W. Bevard executed a Last Will and Testament that directed the disposition of his estate by, in part, providing for the establishment of a trust. The will appointed Mercantile Safe Deposit and Trust Company (Mercantile) to serve as trustee and mandated that the trust be divided into four equal shares. The will granted one of those shares to Marion's sister, Rebecca "Reba" Bevard, for the duration of her life (the Trust). Following Marion's death in February 2002, his estate was probated in the Orphans' Court for Baltimore County. Pursuant to the terms of the will, the personal representative of the estate established the Trust and funded it with a $450,450.98 contribution. Under the terms of the Trust, Reba was to receive income from the Trust as well as discretionary distributions of the Trust principal, for life. Upon her death, the remainder of the Trust was to be distributed to Robert B. Kirkwood and, if he died before Reba, the remainder was to be distributed in equal shares to his descendants. The Trust, therefore, had two components: the life estate created for the benefit of Reba, *see* § 7–201(c)(2)(i), and the remainder interest, which qualifies as a "subsequent interest" for tax purposes, created for the benefit of Robert B. Kirkwood or his descendants, *see* § 7–201(e)(1).

---

1. All statutory references hereafter are to the Tax–General Article (1988, 2010 Repl.Vol.), unless otherwise specifically noted.

**14**

Robert B. Kirkwood predeceased Reba, who died on October 11, 2007. Therefore, upon Reba's death, the remainder of the Trust—the subsequent interest—passed to Robert B. Kirkwood's four children: Petitioners Barbara Hastings, R. Cort Kirkwood, and Ann K. Robinson; and their brother, Robert Garth Kirkwood. Because Reba was the testator's sister, the income and principal she received through the Trust was not subject to inheritance tax. *See* § 7–203(b)(2)(vii). Petitioners and their brother, however, inherited as collateral heirs, so they were obligated to pay ten percent (10%) of the value of the assets on the subsequent interest in the Trust.[2] The inheritance tax was owed, prior to distribution of the assets to Petitioners and their brother, because the personal representative had not opted to prepay the tax on the subsequent interest, as authorized by § 7–219, at the time the Trust was created.[3] Thus PNC, as the successor trustee to

---

2. Section 7–204 provides, in pertinent part:

(b) *Collateral tax rate.*—The inheritance tax rate is 10% of the clear value of the property that passes from a decedent.

3. The Maryland Tax Code provides two different methods of paying the inheritance tax. Pursuant to § 7–219, the tax may be prepaid. Section 7–219 provides:

(a) *Application.*—Within a reasonable time after the valuation of a less than absolute interest in property that passes from a decedent, an application to prepay the inheritance tax for a subsequent interest in the same property may be filed with the register of the county where the inventory was filed under § 7–225 of this subtitle.

(b) *Applicant.*—(1) An application under subsection (a) of this section may be filed by or for a person or class of persons, whether or not then in being, in whom may vest a subsequent interest in the property valued.

(2) An application under subsection (a) of this section may not be made by or for a person who, under the instrument that created the property interests, has no interest other than the possibility of becoming an appointee by the exercise of a power of appointment.

(3) A person who only has the interest described in paragraph (2) of this subsection is entitled to receive the benefits of prepayment under § 7–210(b) of this subtitle.

Section § 7–210 provides:

(a) *If application to prepay tax is filed.*—(1) If an application to prepay inheritance tax for a subsequent interest in property is filed under § 7–219 of this subtitle, the value of the subsequent interest is

Mercantile, filed an Application to Fix Inheritance Tax on Non–Probate Assets with the Register of Wills for Baltimore County on December 8, 2007. In its filing, PNC reported that

determined by subtracting the value of all preceding and concurrent interests from the value of the whole property.

(2) The total inheritance tax on all interests in the property valued shall equal the inheritance tax that would have been due if an absolute interest in the property passed from the decedent.

(b) *If interest vests in nonapplicant.*—(1) If a subsequent interest in property ultimately vests in possession in a person other than the person by or for whom an application to prepay the inheritance tax was filed under § 7–219 of this subtitle and if the inheritance tax determined under the prepayment application was paid:

(i) the subsequent interest shall be revalued when it vests in possession; and

(ii) the inheritance tax due on the subsequent interest shall be redetermined based on the value of the interest when it vests in possession and on the relationship of the original decedent to the person in whom the interest ultimately vests in possession.

(2) A deduction from the inheritance tax calculated under paragraph (1)(ii) of this subsection for prepaid inheritance tax on the interest shall be allowed.

(c) *If no application to prepay tax is filed or no tax paid.*—(1) If an application to prepay the inheritance tax for a subsequent interest is not filed in accordance with § 7–219 of this subtitle or if the inheritance tax determined for the subsequent interest under a prepayment application is not paid when due under § 7–217(d) of this subtitle:

(i) the whole property shall be valued when the subsequent interest vests in possession;

(ii) the value of the subsequent interest shall be valued when it vests in possession in the manner stated in subsection (a) of this section; and

(iii) the inheritance tax due on the subsequent interest shall be determined based on the value of the interest when it vests in possession and on the relationship of the original decedent to the person in whom the interest ultimately vests in possession.

(2) A deduction for inheritance tax previously paid on any interest in the property may not be allowed.

(d) *When applicants pay different rates.*—(1) If the inheritance tax applies to 1 or more of the persons by or for whom an application to prepay the inheritance tax is filed under § 7–219 of this subtitle and the exemption under § 7–203(b) of this subtitle applies to others, the inheritance tax applies to the subsequent interest.

(2)(i) On application of a party in interest, the inheritance tax due may be apportioned among the persons by or for whom the application to prepay the inheritance tax is filed.

(ii) After the apportionment, each of those persons is responsible only for the amount of the inheritance tax apportioned to that person.

**16**

the Trust had a fair market value of $261,306.72 on the date of Reba's death, October 11, 2007. Of that amount, approximately $218,100.00 constituted the remainder of the original $450,450.98 principal contributed by Marion's estate, and the remaining approximate $42,200.00 was income earned on that principal. To calculate the necessary inheritance tax and commission it was entitled to draw as trustee, PNC used the fair market value of the Trust—$261,306.72. PNC first subtracted a one-half percent final-distribution commission ($1306.53), to which it was statutorily entitled according to § 14–103(e) of the Maryland Code (2001, 2011 Repl.Vol.), Estates and Trusts Article (ET),[4] as well as a separate trustee fee ($366.69). From the resultant difference of $259,633.50, PNC applied the ten percent inheritance tax rate. Consequently, PNC tendered a $25,963.35 check to pay the inheritance tax, drawn from the Trust account, that was accepted and recorded by the Register of Wills on December 17, 2007.

With the inheritance tax paid, PNC began the task of distributing the Trust's assets to the beneficiaries. To that end, PNC sent to each Petitioner and Robert Kirkwood a letter that included, among other things, an accounting of the entire Trust and a "Waiver, Receipt, Release and Indemnification Agreement" (Release Agreement). The letter directed that, if the beneficiaries approved of the accounting, they should sign the attached Release Agreement and return it to PNC. The letter further explained that, "[u]pon receipt of the executed Releases from all of the [beneficiaries], we will be in a position to have the cash disbursed."

---

4. ET § 14–103 provides, in pertinent part:

(e) *Final distribution.*—Upon the final distribution of any trust estate, or portion of it, an allowance is payable commensurate with the labor and responsibility involved in making the distribution, including the making of any division, the ascertainment of the parties entitled, the ascertainment and payment of taxes, and any necessary transfer of assets. The allowance is subject to revision or determination by any circuit court having jurisdiction. In the absence of special circumstances the allowance shall be equal to one half of one percent upon the fair value of the corpus distributed.

The Release Agreement provided that "the Trust has terminated; and ... the parties in interest have requested that PNC distribute the Trust assets ... without the filing, audit and adjudication of an account of PNC's administration of the Trust with a court of competent jurisdiction." In consideration of terminating the Trust by "settl[ing] PNC's administration of the Trust on an informal basis without having an accounting filed with [a] Court," the Release Agreement requested, among a number of items, that the beneficiaries: (1) acknowledge that they had consulted with an attorney (or had chosen affirmatively not to do so); (2) declare that they had reviewed the books, records, and statements of the Trust, and; (3) approve of PNC's handling and administration of the Trust. Pertinent to this appeal, the Release Agreement contained a clause releasing PNC from liability and requiring the beneficiaries to indemnify PNC for certain expenses attached to the termination of the Trust (release and indemnity clause). That clause read:

> [E]ach of the undersigned hereby: ... Releases, indemnifies and holds PNC, in its corporate capacity and as Trustee, harmless from and against any and all losses, claims, demands, surcharges, causes of action, costs and expenses (including legal fees), which may arise from its administration of the Trust, including, but not limited to, the overall investment strategy of the Trustee, all decisions made and actions taken or not taken with regard to the administration of the Trust, and PNC's distribution of the assets to the Beneficiaries as set forth on the attached schedule.

By letter dated January 2, 2008, John M. Robinson, an attorney and the husband of one of the Petitioners, Ann K. Robinson, objected on behalf of all four beneficiaries to PNC's plan for distribution of the Trust assets. The objection touched off a flurry of correspondence between Mr. Robinson and PNC during the subsequent four months. Mr. Robinson voiced two major objections on behalf of the beneficiaries: (1) the release and indemnity clause was far too favorable to PNC and the beneficiaries could not be required to execute it before receiving their distributions; and (2) PNC misinterpreted

provisions of the Tax–General Article, which caused it to over-calculate its commission and the inheritance tax owed on the Trust assets. The beneficiaries therefore demanded an immediate distribution of the Trust assets and the return of overpaid monies paid to the Register of Wills on the Trust's behalf.

In response, PNC defended its calculation of the inheritance tax and explained that execution of the Release Agreement, including execution of the release and indemnity clause, was not a required step towards obtaining a distribution. PNC advised that, instead of utilizing a private agreement, under Maryland law it could petition a court for a final accounting and termination of the Trust to obtain the protection it had sought in the release and indemnity clause. The agreement and clause were offered to the beneficiaries as a matter of industry practice, "since the majority of beneficiaries prefer to terminate their trust via private agreement instead of petitioning a court." Nonetheless, PNC released a partial distribution of $33,319.97 to each of the beneficiaries, seemingly in response to their objections, while predicating final distributions upon the execution of the appropriate Receipt and Release Agreement or court approval of a final accounting.

Petitioners, contemporaneous with the partial distribution and therefore without knowledge of it, filed a three-count complaint for declaratory judgment in the Circuit Court for Baltimore County.[5] In Count I Petitioners alleged that "[n]othing in Maryland law gives PNC the right to demand the Agreement and withhold payment absent its execution." Petitioners sought a judgment declaring unlawful PNC's "demand" for the execution of the release and indemnity clause prior to the distribution of any funds from the Trust. Count I

---

5. As mentioned, Petitioners' brother, Robert Garth Kirkwood, a resident of Florida, did not join the suit. PNC moved to dismiss the complaint, citing Maryland Rule 2–211 and arguing that his joinder was "necessary and indispensable for relief on the merits and as requested by the plaintiffs." After a hearing, the Circuit Court denied the motion, reasoning that the court could not join Robert as a plaintiff, defendant, or involuntary plaintiff, pursuant to Rule 2–211(a)(2), because it could not exercise personal jurisdiction over him. That decision has not been appealed.

also prayed for declaratory relief directing PNC to distribute the entire corpus of the Trust without further delay.

In Counts II and III Petitioners addressed their challenge to PNC's calculation of the distribution commission and inheritance tax. Petitioners alleged that PNC wrongly based its calculation on the $261,306.72 fair market value of the Trust, because that amount included the income earned on the $218,130.00 remaining principal that had been contributed by Marion's estate. Instead, according to Petitioners, PNC should have computed the tax solely on the amount of principal because § 7–203(j) provides that "[t]he inheritance tax does not apply to the receipt of property that is income, including gains and losses, accrued on probate assets after the date of death of the decedent." PNC's alleged failure to use the correct value resulted in a $4,313.71 overpayment in inheritance taxes and a $69.59 overpayment in the distribution commission. Count II prayed for relief declaring "that PNC must use $218,130.00 as the basis for calculating inheritance tax in this case"; Count III prayed for similar relief in the calculation of PNC's commission. Both counts prayed for monetary damages from loss of income, prejudgment interest, and attorneys' fees.

PNC timely filed an answer and a counterclaim. In the answer PNC raised a number of defenses to liability and in the counterclaim petitioned the Circuit Court to assume jurisdiction over the Trust pursuant to Rule 10–501.[6] The counterclaim further prayed that the court "eventually approve a Final Account by the Trustee, approve distributions to the interested persons, and release and discharge PNC Bank as Trustee from further liability."

After a period of discovery, the parties filed cross-motions for summary judgment. PNC filed a motion requesting sum-

---

6. Rule 10–501 provides, in pertinent part:

(a) **Who may file.** fiduciary or other interested person may file a petition requesting a court to assume jurisdiction over a fiduciary estate other than a guardianship of the property of a minor or disabled person.

mary judgment on Counts II and III, arguing that Petitioners suffered from a "fundamental misunderstanding of the Maryland Inheritance Tax scheme as it applies to Trusts and remainder interests." PNC asserted that Petitioners' reliance on § 7–203(j) was misguided because that subsection, by its own terms, applies only to "probate assets," and the funds in the Trust were not probate assets. According to PNC, those funds constituted only a subsequent interest, so § 7–210(c), establishing the method for calculating the inheritance tax on a subsequent interest, provided the only proper method for determining the value of the Trust. That subsection states: "[T]he inheritance tax on the subsequent interest shall be determined based on the value of the interest when it vests in possession." PNC argued that, because the Petitioners' interest in the remainder of the Trust vested upon Reba's death and the Trust's fair market value was $261,306.72 on the date of Reba's death, $261,306.72 was the correct value for calculating the inheritance tax and the commission.

PNC did not move for summary judgment on Count I because it believed that its counterclaim, asking the Circuit Court to assume jurisdiction over the Trust, "moot[ed]" that issue. PNC agreed with Petitioners that a trustee could not demand the execution of a private release and indemnity clause. PNC argued, though, that it did not demand that the Petitioners sign the Release Agreement or accede to the release and indemnity clause; it *requested* that the Petitioners do so in order that the Trust could be terminated expeditiously while obtaining the same protection the Trust would have received from a court's accounting. Therefore, according to PNC, the lawfulness of a demand for a release and indemnity clause became moot when PNC withdrew its request and moved, by counterclaim, to terminate the Trust by filing a petition with the Circuit Court.

Petitioners responsively moved for summary judgment on all three counts. On Count I they argued that, by demanding execution of the release and indemnity clause, PNC required the Petitioners to release and indemnify PNC against all losses and expenses that arose from the administration of the

Trust. Petitioners asserted that nothing under Maryland law granted PNC the ability to demand as much, and no court in the State could grant an order that released PNC from liability and indemnified PNC for expenses as broadly as the proffered clause. In relation to Counts II and III, Petitioners reasserted that § 7–203(j), excepting the inheritance tax from "receipt of property that is income . . . accrued on probate assets after the date of death of the decedent," applied to the Trust. As a result, $218,130.00 was the proper amount on which the inheritance tax should have been calculated.

After a hearing, the Circuit Court issued an order assuming jurisdiction of the Trust. By the same order, the court also granted PNC's motions on Counts II and III and entered judgment on those counts in PNC's favor, agreeing with PNC's interpretation of §§ 7–203(j) and 7–210(c). The court denied Petitioners' motion on all counts and specified in its order, in relation to Count I, that Petitioners "were not required to sign any [Release Agreement]." The court, however, did not enter judgment in favor of either party on Count I, reasoning that there remained a question of whether Petitioners lost income because of PNC's request.

PNC subsequently filed with the court an inventory and final accounting of the assets in the Trust. PNC also filed a Petition for Attorney's Fees and a Petition for Court Approval of Final Account and Termination of Trust and for Discharge of PNC Bank, N.A. as Trustee.

Because no judgment had been entered on Count I, Petitioners renewed their Motion for Summary Judgment as to Count I. After a second hearing, the Circuit Court granted in part PNC's Petition for Attorney's Fees, awarding PNC $20,000 in fees, and issued an order terminating the Trust, directing distribution of the Trust assets, and discharging PNC from further responsibility following the distribution. Finally, the court denied Petitioners' renewed motion for summary judgment, specifically finding that PNC requested, rather than "required," that the release and indemnity clause be executed. Because the court could not "find . . . any

Maryland Law against a fiduciary requesting a [Release Agreement] as was done in this case," the court entered judgment in favor of PNC on Count I and dismissed the complaint with prejudice.

Petitioners noted an appeal to the Court of Special Appeals. That court affirmed the judgment of the Circuit Court in an unreported opinion. Petitioners sought, and we granted, a writ of certiorari, *Hastings v. PNC Bank, NA,* 424 Md. 291, 35 A.3d 488 (2012), to answer the following questions:

1. Whether a Maryland trustee can lawfully demand or request an indemnity from its beneficiaries that is broader than the protection that the trustee could have obtained through a court order or a release like that permitted for a personal representative?

2. Whether Section 7–203(j) of the Tax–General Article should have been applied to the trust assets in this case being distributed to remaindermen so as to exempt the income and gains they received from any inheritance tax?

## II.

In this appeal, the Circuit Court entered summary judgment in favor of PNC on Counts I and II[7] of the complaint. "A trial court may grant summary judgment when there is no genuine dispute of material fact and a party is entitled to judgment as a matter of law." *Appiah v. Hall,* 416 Md. 533, 546, 7 A.3d 536, 544 (2010) (quoting *120 West Fayette Street, LLLP v. Mayor of Baltimore,* 413 Md. 309, 329, 992 A.2d 459, 471 (2010)). Our task on appellate review is therefore two-fold: we "must first determine whether there is any genuine dispute of material facts," *Beka Indus., Inc. v.*

---

7. Petitioners have not pursued in this Court their appeal of the Circuit Court's judgment in PNC's favor on Count III. Petitioners only mention in their brief that "[b]oth parties have always agreed that the result in Count III follows the result in Count II." Because Petitioners make no "stand alone" challenge to Count III, we have no cause to, and thus do not, address the Circuit Court's entry of judgment in favor of PNC on Count III, nor do we comment on the parties' agreement that "the result in Count III follows the result in Count II."

*Worcester Cnty. Bd. of Educ.,* 419 Md. 194, 227, 18 A.3d 890, 910 (2011) (quoting *Dashiell v. Meeks,* 396 Md. 149, 163, 913 A.2d 10, 18 (2006)), and then determine the legal correctness of the Circuit Court's judgment, *Appiah,* 416 Md. at 546, 7 A.3d at 544.

Petitioners' challenge to the Court's judgment in PNC's favor on Counts I and II are grounded in purely legal arguments, to which we accord a non-deferential standard of review.

### *Legal Validity of the Release Agreement*

Petitioners' first challenge relates to the Release Agreement that PNC sought to have Petitioners and their brother execute. They focus on the following clause in the Agreement, which we restate for clarity and ease of reference:

6. Releases, *indemnifies and holds PNC,* in its corporate capacity and *as Trustee, harmless from* and against *all losses,* claims, demands, surcharges, causes of action, costs and expenses (including any and all legal fees), *which may arise from its administration of the Trust, including,* but not limited to, the overall investment strategy of Trustee, *all decisions made and actions taken or not taken with regard to the administration of the Trust,* and PNC's distribution of the assets to the Beneficiaries as set forth on the attached schedule.

(Emphasis added by Petitioners.)

Petitioners argue that PNC demanded unanimous execution of the release and indemnity clause "as a condition precedent to any distribution," and such a demand "violates the Maryland law of trusts by turning it on its head." They cite several provisions of the Estates and Trust Article but make no argument that any of those provisions, either expressly or by implication, prohibits the action PNC took. The heart of Petitioners' argument, instead, is that the release and indemnity clause is over-broad. In Petitioners' words, the release and indemnity clause would force them to release and indemnify PNC "against *all losses and expenses* that arise from

[PNC's] administration of the Trust." (Emphasis added). Such terms, according to Petitioners, are so favorable to PNC that the clause, in effect, "attempt[s] to contractually place the beneficiaries in the position of protecting the trustee when it should be the other way around." Petitioners claim that PNC, by requesting execution of the clause, breached its common law, "universally recognized[,] basic duty of good faith" by placing its own interests before the interest of Petitioners. Not surprisingly, PNC disagrees.

■ Generally, to determine whether a trustee wields lawful authority to take certain actions in connection with trust matters we look to three different sources: (1) the instrument that creates the trust; (2) applicable statutes; and (3) the common law. See ET, § 15–102(b)(2); see also Restatement (Third) of Trusts § 85 (2007)[8] ("In administering a trust, the trustee has, except as limited by statute or the terms of the trust, (a) all of the powers over trust property that a legally competent, unmarried individual has with respect to individually owned property, as well as (b) powers granted by statute or the terms of the trust."). In this case, the creating instrument (i.e. Marion Bevard's Last Will and Testament) and applicable statutes are of no assistance.[9] Disposition of

---

**8.** All references hereafter to the Restatement are to the Restatement (Third) of Trusts, unless otherwise noted.

**9.** Marion Bevard's Last Will and Testament provides in Section 5.2.D.(3):

The receipt and release of the person or institution to whom any distribution is made pursuant to the terms of Sections 5.2.D.(1) or 5.2.D.(2) shall be a sufficient and complete discharge of the fiduciaries making such distribution with respect to such distribution.

Section 5.2.D.(3), however, is applicable, by its own terms, only to distributions made to minors, disabled beneficiaries, and for education or medical care. It is not applicable to distributions like the one at issue in the present appeal and therefore not applicable to resolution of this case.

In regards to applicable statutes, we have interpreted ET § 9–111 to "allow[] a personal representative to obtain a release from legatees even when acting pursuant to the distribution order of an orphans' court, and such a court may order those legatees to sign the release when the personal representative so requests." *Allen v. Ritter*, 424 Md.

this appeal, therefore, requires us to determine whether PNC's request for execution of the release and indemnity clause contravenes Maryland common law.

Preliminarily, nothing in the testator's will precluded the trustee from exercising whatever authority the trustee was already allowed by law. The law of Maryland, moreover, permits a trustee to request a release, and Petitioners do not argue the contrary. As for Petitioners' assertions of breach of fiduciary duty and overbreadth, both fall short.

 A trustee owes to the beneficiaries of a trust duties of administration, prudence and loyalty. The trustee's duty of loyalty—as the duty is known in this state—is well-established in the common law. *Bd. of Trustees v. Mayor of Baltimore,* 317 Md. 72, 109, 562 A.2d 720, 738 (1989). Broadly put, the duty prohibits a trustee from using the property of a beneficiary for the trustee's own purposes. *Gianakos v. Magiros,* 238 Md. 178, 185–86, 208 A.2d 718, 722 (1965). A trustee is otherwise prohibited from "placing himself in any position where his self-interest will or may conflict with his duties as trustee," and "using the advantage of his position to gain any benefit for himself at the expense of the beneficiary." *Hughes v. McDaniel,* 202 Md. 626, 632, 98 A.2d 1, 4 (1953). A trustee also must refrain from using the advantages of the fiduciary relationship for the benefit of a non-beneficiary third party. *Bd. of Trustees,* 317 Md. at 109, 562 A.2d at 738.

 Of course, it is equally well-established that the restrictions associated with the duty of loyalty are not absolute. *See, e.g., Goldman v. Rubin,* 292 Md. 693, 705–06, 441 A.2d 713, 720 (1982); *Turk v. Grossman,* 176 Md. 644, 666, 6 A.2d 639, 650 (1939). A trustee may engage in an otherwise-prohibited course of action if authorized "by statute, by the instrument creating the trust, or by the court having jurisdic-

216, 231, 35 A.3d 443, 452 (2011). ET § 9–111, though, by its own terms, applies only to the power of a personal representative making a distribution from an estate. There exists no comparable subsection in the Maryland Code applicable to trustees making a distribution from a fiduciary trust.

tion of the subject matter." *Goldman,* 292 Md. at 706, 441 A.2d at 720 (quoting *Harlan v. Lee,* 174 Md. 579, 593, 199 A. 862, 869 (1938)); *accord* Restatement, *supra* § 78 cmt. (a); 3 Austin Wakeman Scott et al., *Scott and Ascher on Trusts,* § 17.2 at 1084 (5th ed.2007). Likewise, and important for the purposes of this appeal, a trustee may engage in a self-interested course of action so long as the beneficiaries provide valid, informed consent. *Goldman,* 292 Md. at 706, 441 A.2d at 720; *Grossman,* 176 Md. at 666, 6 A.2d at 650; *accord* Restatement, *supra* § 78 cmt. (c)(3) ("A particular transaction that would otherwise violate a trustee's duty of loyalty may be authorized by consent properly obtained from or on behalf of all of the trust beneficiaries.").[10]

It almost goes without saying that, if the law countenances consent to what would otherwise be a breach of the duty of loyalty, the law also must countenance requests for consent. If not, then a trustee would be unable to solicit consent without first breaching the duty. Put simply, one must be able to ask for permission in order to obtain it. It is easy to see, then, that PNC could not have breached its duty of loyalty in this case merely by asking Petitioners and their brother to execute a reasonable release and indemnity clause.

The terms of the release and indemnity clause, moreover, are not so broad and one-sided as to place impermissibly PNC's interests before those of Petitioners. The clause, as we

---

**10.** The dissent accuses PNC of not providing the beneficiaries with "full and complete information" explaining their rights sufficient to overcome this prohibition against self-interested dealings. We do not dispute that a trustee has the duty to provide beneficiaries with "full information and complete understanding of all the facts." *McDaniel v. Hughes,* 206 Md. 206, 220, 111 A.2d 204, 210 (1955). But that is not the question before this Court, and the parties did not brief or argue that issue on appeal. Instead, we are asked to decide whether a Maryland trustee lawfully can request the type of indemnity PNC sought here, not whether PNC's release agreement provided sufficient information to the beneficiaries. We note, however, that trustees seeking similar indemnification agreements in the future should adhere to the principle of "full information" in order to allow beneficiaries to make informed decisions.

read it, contains two terms: First it "[r]eleases" PNC, "in its corporate capacity and as Trustee," from "any claims," "demands," and "causes of actions" arising from the administration of the Trust; and second, it requires that PNC be "indemnifie[d]" for "all" "surcharges," "costs," and "expenses (including legal fees)" arising from the administration of the Trust. These two terms track closely, although not perfectly, to the terms PNC would have received had it petitioned for (and received) a court order formally approving the accounting and termination of the Trust.

Maryland Rule 10–501 authorizes a fiduciary or any "interested person" [11] to "file a petition requesting a court to assume jurisdiction over a fiduciary estate other than a guardianship of the property of a minor or disabled person." A trustee or beneficiary may invoke Rule 10–501 to obtain instruction from a court on how to proceed with the distribution of trust funds when there is some doubt as to the powers or duties of the trusteeship. *See* Restatement, *supra* § 71. A trustee may choose to petition a court under Rule 10–501 to obtain a court order that approves of the trustee's accounting of the trust's corpus. *See* Restatement, *supra* § 71 cmt. (c). Generally, a trustee will do this because "the judicial settlement of a trustee's account renders *res judicata* all matters in dispute and determined by the court in settling the account, as well as all matters that were open to dispute but not actually disputed," 4 Scott, *supra* § 24.25 at 1789; thus, "a court order approving all or part of a trustee's accounts discharges the trustee from liability (or further liability) for matters appropriately disclosed," Restatement, *supra* § 83 cmt. (c). *Accord Harlan v. Gleason*, 180 Md. 24, 30, 22 A.2d 579, 581–82 (1941) ("The long-accepted practice in closing trust estates, as indicated by all the authorities, . . . is for the trustee to collect all trust funds, report to the court, have an audit stated, and actually distribute the fund accordingly as the court orders. That procedure must be followed, otherwise the trustee could

---

11. Maryland Rule 10–103(f)(2) defines "interested person" as, among other things, "a current income beneficiary of the fiduciary estate."

not secure proper and binding releases so as to relieve himself and his bond."); Restatement, *supra* § 71 cmt. (b) ("[I]nstructions provided by an appropriate court will bind the trustee and beneficiaries who ... are properly made parties to the proceedings."); 4 Scott, *supra* § 23.1 at 1645 ("Judicial approval of a trustee's accounts generally gives the trustee the defense of *res judicata* as to all matters adequately disclosed. Thus, judicial approval generally bars the beneficiaries from subsequently surcharging the trustee with respect to anything that is within the scope of the accounting.").

Moreover, a trustee is generally entitled to indemnity for expenses incurred reasonably and properly in the course of administering a trust. Restatement, *supra* § 38(2). Maryland law provides explicitly for this right to indemnification, mandating that "a trustee ... [i]s entitled to reimbursement from trust property for reasonable expenses incurred in the performance of fiduciary services." ET § 14–405(m)(1). Satisfaction of the trustee's right to indemnification can be accomplished by lien; that is, the trustee gains a security interest in the trust's assets upon incurring reasonable and proper expenses on the trust's behalf. 4 Scott, *supra* § 22.1.1 at 1627. This security interest takes priority over the interest of the beneficiaries, so "[t]he beneficiaries are not entitled to distribution of the trust property until the trustee has been indemnified." *Id.* at 1629. Finally, the amount of indemnification to which a trustee is entitled can be "enlarged or diminished by agreement between the trustee and the beneficiaries." Restatement, *supra* § 38 cmt. (f).

All this is to say that, before PNC presented the Release Agreement to Petitioners and their brother, PNC was legally entitled to some measure of protection and indemnity. With or without the consent of Petitioners, PNC was free under Rule 10–501 to begin judicial proceedings to audit and terminate the Trust. Those proceedings eventually would have resulted in a court order that would have barred, as *res judicata,* all matters disputed and open to dispute in settling the Trust account. Moreover, PNC was entitled to indemnifi-

cation for "reasonable expenses incurred in the performance of fiduciary services," ET § 14–406(m)(1), before distribution of the Trust's corpus took place. No matter what occurred in connection with the Release Agreement, then, Petitioners, in this narrow and specific context, would have ended up in a position where their interest in the distribution of the Trust's funds was subordinated to PNC's interest in protection from legal liability and indemnification for costs.

Against this backdrop, the terms of PNC's release and indemnity clause are not a radical departure from the common law protection and statutory right to which PNC already was entitled. To be sure, the release and indemnity clause sought protection for PNC in its role as trustee *and* "in its corporate capacity." [12] The clause also sought a right to indemnification for "all" costs arising from the administration of the Trust, rather than all costs reasonably and properly incurred. These differences are material and represent a fairly sizeable increase in the amount of protection PNC would have received, as trustee, from liability and cost. The differences, though, are of degree rather than kind. The differences do not represent a reorientation of the interests that PNC and Petitioners respectively possess, but represent, at bottom, PNC's arm's length request to exchange increased protection and indemnity for a quicker and less costly distribution of trust funds. Petitioners retained the choice to accede to that request, perhaps negotiate a release agreement not as broad in its protection of PNC, or simply reject it out of hand and accept the delay in distribution.

_____

12. We note that such language would not extend protection to other services provided to the Trust by PNC. For example, although the trust department of a financial institution could obtain a release of liability and indemnification agreement for the activities of its trust department in administering the trust, it could not seek a release of liability of its securities brokerage for brokerage services provided to the trust, if the trustee happened to employ the institution's own brokerage division to execute trades on behalf of the trust. Otherwise, the financial institution would effectively use its position as trustee to obtain a release for its securities division, which would appear at odds with the duty of loyalty.

It is also worth noting that, no matter the terms of the clause itself, the Release Agreement could not protect PNC from liability arising from fraud, material mistake or irregularity on PNC's part. *See Allen v. Ritter*, 424 Md. 216, 229–30, 35 A.3d 443, 450–51 (2011). Had PNC presented a fraudulent or inaccurate accounting to a court, that court's order approving the accounting, distribution, and termination of the trust would not have stood as a *res judicata* bar to those matters fraudulently or inaccurately represented. *See* Restatement, *supra* § 83 cmt. (c) ("Because a trustee has an affirmative duty to disclose relevant information, a matter involving sensitive issues must be revealed in the accounting with sufficient clarity to invite attention to the issue if the court order is to protect the trustee as a matter of issue preclusion."); *see also*, 4 Scott, *supra* § 23.1 at 1645 ("Of course, a trustee who in rendering the account is guilty of fraud or fraudulent concealment is not protected."). Moreover, "this Court has consistently held that fraud can and will invalidate an otherwise-complete release of liability." *Allen*, 424 Md. at 229, 35 A.3d at 450.

We therefore hold that the Circuit Court correctly denied Petitioners' motion for summary judgment as to Count I. PNC's request for execution of the release and indemnity clause was only that—a request for consent to take a certain course of action. Moreover, PNC's request, though expanding upon an interest already possessed, was not in its terms so one-sided as to place impermissibly its own interests ahead of those of Petitioners. PNC's action, not prohibited by statute, was likewise lawful under the common law. The Circuit Court properly entered judgment in PNC's favor on Count I of the complaint.

*Application of the Inheritance Tax Rate to the Trust*

We turn next to Petitioners' challenge to the Circuit Court's grant of summary judgment in favor of PNC on Count II of the complaint, which assailed the method used by PNC to calculate the amount of inheritance tax due the Register of Wills prior to distribution. On this issue the parties are

generally in accord. They agree that Petitioners are collateral relatives of Marion Bevard, owing a ten percent inheritance tax on the value of the Trust assets.

The parties part company, though, on the value of the assets upon which the tax rate should be calculated. Petitioners argue that the tax should be assessed on the $218,130.00 that constitutes the remainder of the original contribution from Marion's estate, while PNC asserts that $261,306.72, which includes income accrued on that contribution, is the correct figure. Understanding how each party arrives at its respective figure necessitates a brief explanation of the application of inheritance taxes in Maryland.

Section 7–202 of the Tax–General Article imposes a ten percent inheritance tax "on the privilege of receiving property that passes from a decedent and has a taxable situs in the State." *See* § 7–204(b) ("The inheritance tax rate is 10% of the clear value of the property that passes from a decedent."). The tax applies broadly to property passing by devise, including property held in trust. *See* § 7–201(d)(1)(i). A devisee need not hold a vested, absolute interest in the devised property for the inheritance tax to apply; by law, the inheritance tax is applicable to a range of future and non-absolute interests. *See* §§ 7–208, 7–209. Pertinent to this case, the inheritance tax applies to property in which a devisee holds only a "subsequent interest," which is defined as "a vested or contingent remainder, executory or reversionary interest, or other future interest that is created by a decedent and will or may vest in possession after the death of the decedent." § 7–201(e)(1). Because operation of Marion's will granted the beneficiaries a remainder interest that vested only upon the deaths of Reba Bevard and Robert Kirkwood, Petitioners and their brother each held only a subsequent interest in the assets of the Trust.

Taxation of a subsequent interest proceeds differently than taxation of a present possessory interest because a subsequent interest does not vest into possession when it is created. Under Maryland law, a subsequent interest can be

taxed by either of two methods. A personal representative administering an estate that contains a subsequent interest may prepay the inheritance tax or defer payment. Prepayment is accomplished when the personal representative pays the inheritance tax at some "reasonable time" after the initial valuation of the devised property, but before the interest vests in the devisee's possession. § 7–219(a). Alternatively, deferring payment is accomplished by merely waiting to pay the tax until the subsequent interest vests into a present, possessory interest.

In terms of the present case, prepayment could have occurred at some reasonable time after Marion's death in 2002, when Marion's estate was administered and the Trust was established. Deferred payment could only happen after Reba's death in 2007, when Reba's life estate terminated and the beneficiaries' remainder interest vested in their possession. The personal representative of Marion's estate opted not to prepay the tax upon creation of the Trust. Petitioners, moreover, filed no application to prepay. They, therefore, necessarily chose to defer payment. This choice is important for a number of reasons, chief among them is that the value used for the calculation of the inheritance tax differs depending on whether a devisee prepays or defers payment.

Pursuant to § 7–210, the general rule for calculating inheritance tax on a subsequent interest is as follows: after a personal representative elects when to pay, the inheritance tax payment is made in the amount of ten percent of the value of the subsequent interest *at the time of the payment.* This is because Maryland law provides that for inheritance tax purposes, a subsequent interest is valued at the time of the payment, § 7–210(a)(1) & (c)(1)(i), and the tax amount is based on that timely value, § 7–210(a)(2) & (c)(1)(iii). In practice, this means that, if a personal representative prepays, the personal representative pays a ten percent tax on the value of the interest at the time of the devisor's death. More important, if a personal representative defers payment, the remainderman pays a ten percent tax on the value of the interest

when it vests, regardless of whether the interest has appreciated or depreciated from its original valuation, *Shaughnessy v. Perlman,* 198 Md. 619, 626, 85 A.2d 38, 41 (1951), because the inheritance tax is a tax on "the estate as it passes to the beneficiary, and not merely ... the estate as it passes from the person who dies 'seized and possessed thereof.'" *Lilly v. State,* 156 Md. 94, 104–05, 143 A. 661, 665 (1928) (quoting *Safe Deposit & Trust Co. v. State,* 143 Md. 644, 648, 123 A. 50, 51 (1923)).

Petitioners argue that PNC miscalculated the amount of inheritance tax due on the assets of the Trust. Specifically, they argue that, in addition to § 7–210, § 7–203(j) applies to the taxation of subsequent interests. That provision states: "The inheritance tax does not apply to the receipt of property that is income, including gains and losses, accrued on probate assets after the death of the decedent." Petitioners thus argue that, when a devisee chooses to defer payment, the devisee pays inheritance tax on the value of the interest at the time it vests *less any income gained or lost during the running of the prior estate.* In other words, according to Petitioners, the value of a vested subsequent interest is derived only from the property that was devised from the devisor to the devisee and not from any income that may have accrued during the intervening estate. Consequently, they assert, PNC should have calculated the inheritance tax on the $218,130.00 value of the beneficiaries' interest that constituted property devised from the estate, instead of using the $261,306.72 figure that included the principal plus accrued income.

In support of their reading of the Tax–General Article, applying § 7–203(j) to the taxation of subsequent interests, Petitioners cite a number of secondary sources and testimonial letters from the legislative history. Their reading, however, relies primarily on two assertions: first, that the assets of the Trust are "probate assets" within the meaning of § 7–203(j); and second, that § 7–203(j) can be read in harmony with § 7–210 so as not to render superfluous or nugatory any provision in the statute.

In support of the former assertion, Petitioners rely on a treatise definition of "probate assets" that includes "remainder interests." In support of the latter assertion, Petitioners argue that the structure of § 7–210 itself provides for what they claim is the proper result.[13] Specifically, Petitioners point to § 7–210(c)(1)(ii), which dictates that when a devisee defers payment, the subsequent interest "shall be valued when it vests in possession in the manner stated in subsection (a)." Petitioners assert that this provision grants a reader license to move to subsection (a), skip over subsection (a)(1), and apply subsection (a)(2) to those instances in which a devisee who has deferred payment must calculate the inheritance tax due. Subsection (a)(2) provides that "[t]he total inheritance tax on all interests in the property valued shall equal the inheritance tax that would have been due if an absolute interest in the property passed from the decedent." Petitioners explain that, if an absolute interest in the Trust had passed to them from

---

13. For reference, we offer again the pertinent text of § 7–210:

(a) *If application to prepay tax is filed.*—(1) If an application to prepay inheritance tax for a subsequent interest in property is filed under § 7–219 of this subtitle, the value of the subsequent interest is determined by subtracting the value of all preceding and concurrent interests from the value of the whole property.

(2) The total inheritance tax on all interests in the property valued shall equal the inheritance tax that would have been due if an absolute interest in the property passed from the decedent.

* * *

(c) *If no application to prepay tax is filed or no tax paid.*—(1) If an application to prepay the inheritance tax for a subsequent interest is not filed in accordance with § 7–219 of this subtitle or if the inheritance tax determined for the subsequent interest under a prepayment application is not paid when due under § 7–217(d) of this subtitle:

(i) the whole property shall be valued when the subsequent interest vests in possession;

(ii) the value of the subsequent interest shall be valued when it vests in possession in the manner stated in subsection (a) of this section; and

(iii) the inheritance tax due on the subsequent interest shall be determined based on the value of the interest when it vests in possession and on the relationship of the original decedent to the person in whom the interest ultimately vests in possession.

(2) A deduction for inheritance tax previously paid on any interest in the property may not be allowed.

the estate, it could not have included income accrued on the Trust's assets, and therefore § 7–210 can be read harmoniously with § 7–203(j) in excluding income from the calculation of the inheritance tax.

PNC disagrees with Petitioners' reading of the Tax–General Article, as does Amicus Curiae State of Maryland.[14] PNC's argument proceeds as follows: the beneficiaries' remainder interest in the Trust is a "subsequent interest," as that term is defined by § 7–201(e). As a result, only § 7–210, entitled "Subsequent interests," governs the taxation of the beneficiaries' interest. Subsection (c) of that provision specifically controls the calculation of the inheritance tax for a devisee who defers payment, providing that the tax amount "shall be determined based on the value of the interest when it vests in possession." Subsection (c) makes no mention of excepting income from the value of the interest when it vests in possession; therefore, income is not so excepted. Moreover, § 7–203(j), by its own plain language, applies only to "probate assets." The assets in the Trust were probate assets only while held by the personal representative of the estate during administration of it. Those assets lost their character as probate assets and became Trust assets when, at the close of probate, they were used to fund the Trust. As a result, § 7–203(j) is inapplicable to this case, and $261,306.72 was the correct value upon which to base the inheritance tax calculation.

■■■■■■ PNC provides the better interpretation of the pertinent provisions. The primary goal of statutory interpre-

---

14. Article V, Section 6 of the Maryland Constitution provides, "It shall be the duty of the Clerk of the Court of Appeals and the Clerks of any intermediate courts of appeal, respectively, whenever a case shall be brought into said Courts, in which the State is a party or has interest, immediately to notify the Attorney General thereof." Following oral argument in this case, this Court, realizing that the State of Maryland generally has an interest in the payment and collection of taxes and in the proper interpretation and application of the Maryland Tax Code, invited the State of Maryland to submit a Memorandum of Amicus Curiae. The State did so on behalf of the Comptroller of the Treasury and the Registers of Wills.

tation is to effectuate the intent of the legislature. *Allen,* 424 Md. at 223, 35 A.3d at 446. The task of interpretation begins with an examination of the plain language of the statute. *Id.,* 35 A.3d at 446. "A plain reading of the statute assumes none of its language is superfluous or nugatory." *Newell v. Runnels,* 407 Md. 578, 640, 967 A.2d 729, 766 (2009) (quoting *Bost v. State,* 406 Md. 341, 350, 958 A.2d 356, 361 (2008)). We do not add or delete words from an unambiguous statute, nor do we entertain a forced or subtle interpretation that extends or limits a statute's meaning. *Id.* at 640–41, 967 A.2d at 766. "When a statute's plain language is unambiguous, we need only to apply the statute as written, and our efforts to ascertain the legislature's intent end there." *Carven v. State Ret. & Pension Sys.,* 416 Md. 389, 407–08, 7 A.3d 38, 49 (2010) (quoting *Crofton Convalescent Ctr., Inc. v. Dep't of Health & Mental Hygiene,* 413 Md. 201, 216, 991 A.2d 1257, 1266 (2010)).

The first defect in Petitioners' interpretation is the definition Petitioners assign to "probate assets," as that term is used in § 7–203(j). We agree with the State, amicus in this appeal, that income earned by a trust during the life tenancy of a beneficiary is not income "accrued on probate assets." As the State points out, neither the Tax–General Article nor the Estates and Trusts Article explicitly defines "probate assets," but ET § 1–301 provides insight into the term's meaning. That section, in outlining the type of property subject to the provisions of the Estates and Trusts Article, provides that "[a]ll property of a decedent shall be subject to the estates of decedents law, and upon the person's death shall pass directly to the personal representative, who shall hold the legal title for administration and distribution." ET § 1–301(a). We can surmise then, that whether an asset is a "probate asset" is linked inexorably to whether legal title to that asset is held by a personal representative for administration and distribution.

We agree with PNC and the State that the personal representative of the estate did not hold legal title to the assets of the Trust after Reba's life estate was established.

The personal representative only held title to those assets during the administration of the estate. The assets of the Trust, therefore, were only "probate assets" during the administration of Marion's estate. Once the administration concluded and the assets were contributed to the Trust, to be administered by a trustee, the assets lost their character as "probate assets" and became simply trust assets. Consequently, the assets of the Trust do not qualify for the exemption laid out in § 7–203(j).

The assets also could not qualify as "probate assets" because such a reading of § 7–203(j) would conflict with the mandates of § 7–210. As our colleagues on the Court of Special Appeals illustrated, Petitioners' reading of § 7–210 forces an interpretation that does not comport with the statute. Specifically, § 7–203(j) can only be made to harmonize with § 7–210 if the latter, parallel to § 7–203(j), excepts income from the calculation of inheritance tax on subsequent interests. In order to read § 7–210 as doing that, one would need to accept that § 7–210(a)(2) governs the determination of inheritance tax when the personal representative defers payment. There is no conceivable support for such a contention.

Subsections (a) and (c) of § 7–210 are distinct subsections. Subsection (a) governs the valuation and calculation of inheritance tax for personal representatives who elect to prepay, while subsection (c) does the same for those who defer payment. Subsection(c)(1)(i) begins by directing that "the whole property shall be valued when the subsequent interest vests in possession." Subsection (c)(1)(ii) then adds that "the value of the subsequent interest shall be valued when it vests in possession in the manner stated in subsection (a)." The last six words of that subsection—"in the manner stated in subsection (a)"—direct the reader to the provision in subsection (a)(1) that prescribes how a subsequent interest is valued ("subtracting the value of all preceding and concurrent interests from the value of the whole property"). Contrary to Petitioners' argument, those six words do not direct the reader to subsection (a)(2), which describes how the inheritance tax is calculated.

Instead, § 7–210(c)(1)(iii) provides explicitly for the determination of inheritance tax when a personal representative defers payment. That subsection states that "the inheritance tax due on the subsequent interest shall be determined *based on the value of the interest when it vests in possession* and on the relationship of the original decedent to the person in whom the interest ultimately vests in possession." (Emphasis added). It is clearly intended to be the sole provision governing deferred payment, never sharing that duty with § 7–210(a)(2). Simply put, if, as Petitioners argue, § 7–210(c)(1)(ii) directed that § 7–210(a)(2) governed the calculation of inheritance tax for a personal representative who deferred payment, it would directly conflict with and render nugatory the provision in subsection (c) that explicitly mandates how to calculate inheritance tax after deferring payment. Reading § 7–210(c)(1)(ii) as Petitioners do essentially reads § 7–210(c)(1)(iii) out of the law, which we are not permitted to do.

Only § 7–210(c)(1)(iii) was intended by the General Assembly to govern the determination of the amount of inheritance tax owed on a subsequent interest when a personal representative chooses to defer payment. Under Petitioners' interpretation, § 7–210 cannot be harmonized with § 7–203(j). Section 7–203(j) excepts income from the inheritance tax, and we have repeatedly interpreted the language of § 7–210(c)(1)(iii) as including income in the inheritance tax calculation. *See Mercantile–Safe Deposit & Trust Co. v. State*, 264 Md. 455, 464, 287 A.2d 502, 507 (1972) (noting that when payment is postponed under Article 81 § 161, which is now § 7–210(c), the remainderman "pays a tax on the value of the interest at the time it comes into possession"); *Shaughnessy*, 198 Md. at 626, 85 A.2d at 41 (stating that the statutory inheritance tax scheme provides that "the taker pays on the basis of what he gets, whether more or less than the value at the date of the testator's death"); *Lilly*, 156 Md. at 105, 143 A. at 665 (noting that the inheritance tax is a tax "on the transmission of the estate, and is a premium for the enjoyment of the benefit thereby secured," therefore the tax must be valued on "the

current money and the appraised assets thus transmitted and acquired") (quoting *Safe Deposit Trust Co.*, 143 Md. at 649, 123 A. at 52). We cannot assume that the legislature intended two provisions, § 7–203(j) and § 7–210, both to apply to the taxation of subsequent interests and to conflict directly with one another. Under Petitioner's interpretation, § 7–203(j) cannot be made to harmonize with § 7–210. We therefore hold that the legislature did not intend for § 7–203(j)'s "probate assets" to include assets like those found in the Trust.

PNC correctly included the income that accrued on the assets of the Trust in its valuation of the Trust for inheritance tax purposes. The Circuit Court properly entered judgment in PNC's favor on Count II.

## III.

In conclusion, PNC's request for execution of the Release Agreement did not contravene Maryland common law. The request was simply that—a request—and it did not ask for a reorientation of the parties' interests. It only asked to redefine the scope of protection and indemnity to which PNC was already entitled, in return for a less costly and more efficient distribution of trust funds. Moreover, PNC was correct in its calculation of the inheritance tax owed on the assets of the Trust. Section 7–203(j), excepting income on "probate assets" from the inheritance tax equation, is not applicable to the tax scenario presented here. The Circuit Court therefore was legally correct in granting summary judgment in favor of PNC.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

BELL, C.J., GREENE and ADKINS, JJ., Dissent.

ADKINS, J., Dissenting.

Just last term, this Court reiterated that "in no state are trustees, whether individuals or corporations, held to a stricter account than in Maryland." *D'Aoust v. Diamond*, 424 Md. 549, 605, 36 A.3d 941 (2012) (citation and quotation marks omitted). The Majority's opinion in this case is a sharp

departure from that principle. The Majority sees "material" differences between the protection the trustee sought under a release and indemnification agreement and the protection it could obtain from the court. Despite that, the Majority approved this practice. This will encourage more widespread use of such unlawful releases, and enable banks and other trustees to cite this case to justify other breaches as one "of degree rather than kind." Maj. Op. at 29, 54 A.3d at 728.

Alternatively, the Majority holds that, even if the release and indemnification agreement breached the trustee's duty of loyalty, a beneficiary may always consent to a breach of trust. In so holding, the Majority ignored the issue of whether the trustee provided the beneficiaries with full and complete information, which is required in any dealings between trustees and beneficiaries, and concluded all too swiftly that the beneficiaries in this case were in a position to give a "valid, informed" consent.

I do not share the Majority's view and respectfully dissent. In this case, the trust beneficiaries ("Beneficiaries") sought a declaratory judgment on the issue of whether "PNC's policy of requiring [a broad release and indemnification prior to the distribution of trust funds] violates Maryland law." [1] For the reasons set forth below, I would hold that it does. I would add that, although beneficiaries may consent to a breach of trust, they can only do so when they have full and complete information regarding the transaction.

## I. PNC's Practice of Seeking Release and Indemnification

No one disputes that it is PNC's common practice to seek release and indemnification agreements such as the one at

---

1. In addition to the declaratory judgment on this issue, in their Complaint filed on April 28, 2008, the trust beneficiaries ("Beneficiaries") sought loss of income, prejudgment interest, and attorney fees, all resulting from PNC's insistence that the Beneficiaries release and indemnify PNC prior to the trust distribution. The Complaint's other two counts were for declaratory relief in relation to the inheritance tax and PNC's final distribution fee. I concur in the Majority's holdings with respect to these other counts.

issue in this case. All along, PNC has characterized such agreements as "customary" and "a prevalent practice." In this case, the preamble to the Release and Indemnification Agreement ("Agreement") recited that the Beneficiaries "requested" trust fund distribution "without the filing, audit and adjudication" of the final accounting by a court, when in fact they had not.[2] After the Beneficiaries protested, pointing out that it "is not true" that they made such a request, PNC continued to insist that it would not "be in a position" to make distributions without the Agreement. It explained that, even though there was no request, "[t]his is standard language and is based on the fact that there is no reason to petition the Circuit Court to terminate the trust."[3] Without any explanation of why "there is no reason" to seek court approval of the final accounting, or the differences between the proposed Agreement and distribution pursuant to a court order, PNC asserted: "the majority of beneficiaries prefer to terminate their trust via private agreement instead of petitioning a court."[4]

## II. The Impermissible Breadth of the Agreement

No one denies that the Agreement would give PNC broader protection from liability than a court order. The Circuit

---

**2.** The Waiver, Receipt, Release and Indemnification ("Agreement") began by stating:

the parties in interest have requested that PNC distribute the Trust assets to the beneficiaries ... without the filing, audit and adjudication ... with a court of competent jurisdiction ..., and PNC has agreed to do so, provided that the parties in interest waive the filing with and auditing of an account of PNC's administration of the Trust with the Court and release and indemnify PNC from any and all claims and liabilities relating in any way to its administration of the Trust.

**3.** Elaborating further, PNC maintained that the release and indemnification agreement in lieu of seeking approval of an accounting by a court "is based more on practice than the procedure of asking the Distributees if they want to incur additional expenses to Petition the Court, legal fees, etc. Accordingly, there is no formal 'request.' "

**4.** According to PNC, "Trustees, both institutional and individual, request such Agreements on a daily basis."

Court noted that "it must have been frustrating to have this demand for the *extremely broad* Waiver Release and Indemnity Agreement that was used...." [5] (Emphasis added.) The Majority concluded that there were "*material [differences that]* represent a fairly sizeable increase in the amount of protection PNC would have received" under a court order. Op. at 29, 54 A.3d at 728 (emphasis added). Yet, the Majority condones PNC's self-initiated upgrade in protection, at the risk and the expense of the Beneficiaries.

### *"Material" Differences the Majority Noticed*

The Majority acknowledges two aspects in which the Agreement went too far. First, the Agreement "sought protection for PNC in its role as trustee *and* 'in its corporate capacity.'" Maj. Op. at 29, 54 A.3d at 728. The Majority admits that this clause would allow PNC to "effectively use its position as trustee to obtain a release for its securities division, which would appear at odds with the duty of loyalty." [6] *Id.* n. 10. Second, the Agreement "also sought a right to indemnification for '*all*' costs arising from the administration of the Trust, rather than all costs *reasonably and properly* incurred." *Id.* at 29, 54 A.3d at 728 (emphasis added). Inexplicably, however, after assessing these differences as "represent[ing] a fairly sizeable increase in the amount of protection PNC would have received," the Majority proceeds to hold that the Agreement is "not so broad and one-sided as to place impermissibly PNC's interests before those of [the Beneficiaries]." *Id.* at 26–27, 54 A.3d at 726–27.

The dichotomy between the Majority's perception of the "material" differences and its holding is striking. The Majority minimizes the differences by later characterizing them as "differences . . . of degree rather than kind," *id.* at 29, 54 A.3d

---

5. The Circuit Court went on to say that although "it must have been frustrating . . . it was not improper."

6. Without further elaboration, the Majority chose to read this broad clause narrowly by noting in a footnote that "such [corporate capacity] language would not extend protection to other services provided to the trust by PNC." Maj. Op. at 29 n. 12, 54 A.3d at 728 n. 12. I would, instead, declare this provision illegal and unenforceable.

at 728, but this rationalization is unconvincing. In my view, these two "material" differences should have led the Court to conclude that the Agreement was overly broad and entitled the Beneficiaries to declaratory relief in their favor.

### The Indemnification Clause

Supplementing the two "material" differences noted by the Majority, I add a third, arguably the most significant one: the indemnification of PNC from "any and all liabilities, relating in any way to its administration of the Trust." Unlike a court order approving trust funds distribution, which would have discharged PNC from liability to the Beneficiaries, but not third parties; and unlike the limited common-law indemnity right, this broad indemnification clause shifts all liability for the trustee's actions to the beneficiaries, even if the liability arose out of the trustee's own negligence. This shift is significant because a trustee's negligence is a risk *it* assumes in undertaking the often-lucrative [7] position as a trustee.

The Majority, however, fails to see this third material difference by focusing exclusively on the release clause and whitewashing the indemnification clause, reading it in such a way that it only pertains to expenses, surcharges, and costs, but not to claims, liabilities, and causes of action by third parties.[8] The Majority's reading of the Agreement is wrong. Paragraph 6 of the Agreement states that, by signing, the beneficiary "[r]eleases, indemnifies, and holds PNC ... harmless from and against any and all losses, claims, demands, surcharges, causes of action, costs and expenses (including

---

[7]. Section 14–103 of the Trusts and Estates Article sets forth the percentages for income commissions, corpus commissions, sales commissions, and final distribution allowances. Md.Code Ann., Est. & Trusts (1974, 2002 Repl.Vol.), § 14–103. The percentages of income commissions vary, depending on the nature and the size of the trust's income. For instance, the commissions "upon all income from real estate, ground rents, and mortgages collected in a year" are six percent. *Id.* at (b)(1).

[8]. The gravity of such a mis-reading is magnified when the risk is not disclosed to the Beneficiaries, as I discuss below.

legal fees)." From a grammatical standpoint, paragraph 6 consists of two complete predicates or clauses: (1) a release and (2) an indemnification of PNC against "against any and all losses, claims, demands, surcharges, causes of action, costs and expenses (including legal fees)."

The Majority, however, dilutes the indemnification clause into something it considers palatable by redacting the terms "any claims," "demands," and "causes of action" and limiting it to "surcharges," "costs," and "expenses." [9] Maj. Op. at 26–27, 54 A.3d at 726–27. This allows the Majority to conveniently avoid the analysis of PNC's attempt to get the Beneficiaries to agree to indemnify it against all possible claims. Instead, the Majority quickly addresses only (1) a release from liability to the beneficiaries, *id.* at 27, 54 A.3d at 727, concluding that a release would have been similar to *res judicata* resulting from a court order, and (2) indemnification, i.e. reimbursement, for expenses, holding that trustees are entitled to reimbursement for reasonable expenses. The Majority's one-sided analysis of the release and indemnification clause comes at a great cost to all trust beneficiaries.

Under common law, upon full disclosure by the trustee, a beneficiary generally may agree to release a trustee from

---

9. The Majority's reading of the term "indemnifies" only in conjunction with the terms "surcharges," "costs," and "expenses" does not comport with the parties' understanding of the clause. PNC did not limit the indemnification clause to expenses as the Majority did. Indeed, in the preamble to the Agreement, PNC expressly stated that by way of the Agreement, the beneficiaries would "release and indemnify PNC from any and all claims." The Beneficiaries also read the term "indemnifies" to pertain not only to expenses but to the other terms contained within paragraph 6 of the Agreement, including "any and all losses, claims, demands [and] causes of action." To illustrate, in his letter to the motions court, one of the beneficiaries complained:

I do not own a law dictionary; but, in my dictionary of the English language, the word "indemnify," is defined as: "compensate (someone) in respect of harm or loss; secure (someone) against legal responsibility for their actions." ... So, in order for me to receive my inheritance, my 25% of the Trust, I have to agree to indemnify the bank from any claims, losses, liabilities, legal fees etc. related to this Trust. This is an intolerable situation.... I [will not] sign a document, which promotes deflection of personal responsibility from the bank onto me.

liability for "breach of trust" and "thereby extinguish such cause of action as may exist." George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 943 (rev.2d ed.1981). Similar to a release, when a trustee or another interested party petitions a court for trust fund distribution under Maryland Rule 10–501, the court's approval of the final accounting "renders *res judicata* matters which were open to dispute, whether or not actually disputed." See also *Restatement (Second) of Trusts* § 220 cmt. a (1959). What this means for our purposes is that once the court approves a final accounting, a beneficiary is barred from suing the trustee on a claim that was or could have been addressed by the court in the first instance. *See Anne Arundel County Bd. of Educ. v. Norville,* 390 Md. 93, 106–07, 887 A.2d 1029, 1036–37 (2005).

Barred claims are, for example, a claim for loss by the beneficiary caused by breach of duty of loyalty, breach of duty of impartiality, breach of trust by selling trust property, breach of trust by improperly investing funds, and breach of trust by failing to make proper investment. *Restatement (Second) of Trusts* § 183, §§ 206 through 212. So long as the trustee makes no "misrepresentation or concealment in presenting [the] account or in obtaining the approval of the court," the court's approval of the final accounting renders these beneficiaries' claims against the trustee *res judicata. Restatement (Second) of Trusts* § 220 cmt. a. A release or *res judicata,* however, does not go as far as the Agreement.[10] Unlike *res judicata* that only bars relitigation of the same or

---

**10.** The parties appreciated this difference too. At the last summary judgment motion hearing, the Beneficiaries' counsel emphasized this difference, arguing that, although PNC continuously referred to the Agreement as a "Release Agreement," "[i]t wasn't [just] a release. It was a waiver and indemnification in which PNC Bank asked the beneficiary to indemnify and hold harmless PNC from its entire administration of the trust estate." At oral argument before this Court, PNC likewise acknowledged that "[T]he release is probably better than a court order" because it contains an indemnity clause. Oral Argument at 10:34, *Hastings v. PNC Bank, NA* (No. 109, Sept. Term 2011), *available at* http://www.courts.state.md.us/coappeals/webcastarchive.html#april2012.

similar claim by the same parties,[11] an agreement to indemnify "is a promise to safeguard or hold the indemnitee harmless against either existing and/or future loss liability" to "a third person, or against loss resulting from the liability." 41 Am. Jur.2d *Indemnity* § 4. Thus, no court approval of a final accounting would ever have the effect of indemnifying the trustee against third-party claims.

These third-party claims may be significant, too. The Restatement (Second) of Trusts gives examples:

[ ] A is a trustee of a tailoring business. He negligently allows the floor of the premises to fall into disrepair. A customer falls through the floor and breaks an arm. Although A is liable to B, he is not entitled to indemnity out of the trust estates.

[ ] A is trustee of an apartment house. By statute owners of apartment houses are required to maintain escapes. A fails to provide such a fire escape. The house burned and as a result of the lack of a fire escape B is in the fire. Although A is liable to B, he is not entitled to indemnity out of the trust estate.

[ ] A is trustee of a grocery business. He employs B to deliver groceries. A knows that B is not a competent driver. In delivering groceries by automobile B negligently runs over C. Although A is liable to C, he is not entitled to indemnity out of the trust estate.

*Restatement (Second) of Trusts* § 247 cmt. d.

As these examples illustrate, under common law, a trustee's right to indemnification is limited. Indemnity for liability upon a contract with third parties or for liability in tort to third persons is only available to a trustee if the liability "was

---

11. As this Court has explained on more than one occasion, *res judicata* bars "the *same* parties from litigating a second lawsuit on the *same* claim, or any other claim arising from the *same* transaction or series of transactions and that could have been—but was not—raised in the first suit." ' *Anne Arundel County Bd. of Educ. v. Norville*, 390 Md. 93, 106, 887 A.2d 1029, 1036 (2005) (quoting *Black's Law Dictionary* 1336–37 (8th ed.2004)(emphasis added)).

properly incurred" and the trustee "was not personally at fault in incurring the liability." *Restatement (Second) of Trusts* § 246, § 247.[12]

Not so for PNC under the Agreement. The Agreement sought to expand PNC's protection—at the Beneficiaries' expense—to include "any and all losses, claims, demands [and] causes of action." In this regard, the Agreement is impermissibly broad. I see no justification for shifting liability for potential misdeeds of the trustee over to the beneficiaries.

### III. Lack of Full and Complete Disclosure

The Majority brushes off the Trustee's over-reaching, preferring instead to focus on the doctrine that "a trustee may engage in self-interested course of action so long as the beneficiaries provide valid, informed consent." Maj. Op. at 26, 54 A.3d at 726 (citations omitted). In supporting its conclusion that a valid and informed consent would have negated a breach of the duty of loyalty, the Majority quotes comment c(3) to Section 78 of the Restatement (Third) of Trusts, which, *inter alia,* states: "A particular transaction that would otherwise violate a trustee's duty of loyalty may be authorized by consent properly obtained from or on behalf of all of the trust beneficiaries." Maj. Op. at 26, 54 A.3d at 726. To the Majority, PNC's efforts to get the Beneficiaries to sign the Agreement are "at bottom, [an] arm's length request to exchange increased protection and indemnity for a quicker and less costly distribution of trust funds." *Id.* at 29, 54 A.3d at 728. The Majority comforts itself with the idea that the Beneficiaries "retained the choice to accede to that request,

---

**12.** Similarly, the current Draft of the Restatement (Third) of Trusts discusses the "now-prevalent practice" of authorizing third parties to file suits against the trustee in its representative capacity, "whether or not the trustee is personally liable, with the trustee protected from personal liability to the extent the trustee acted properly." *Restatement (Third) of Trusts,* (Tentative Draft No. 6, March 14, 2011), § 106, Reporter's Notes. Under the Draft, a trustee acts "properly" if it has not "committed a breach of trust" or "is [not] personally at fault" for the liability. *Id.* at § 106.

... negotiate one not as broad in its protection of PNC, or simply reject it. . . ." *Id.*

The Majority's analysis of consent, however, misses an important point: a beneficiary cannot properly consent to a breach of fiduciary duty without having full and complete information relating to the breach.[13] *Restatement (Third) of Trusts* § 78 cmt. g (for a beneficiary's consent to be valid, the trustee "must be able to show that the dealings were fair and that all relevant and material information that was known, or that should have been known, by the trustee was communicated to the beneficiary or beneficiaries involved."). This Court has emphasized that in all dealings between trustees and beneficiaries, the beneficiary must have "full information and complete understanding of all the facts" pertaining to an otherwise-prohibited transaction. *McDaniel v. Hughes,* 206 Md. 206, 220, 111 A.2d 204, 210 (1955).

This is particularly true when the trustee has superior knowledge of the transaction at issue, such as when the trustee is an attorney for the beneficiaries and is "experienced in the law." *Id.* In those instances, "[t]ransactions for the personal advantage of a trustee . . . are even more improper than similar dealings between laymen," and "[t]o sustain such a tranaction [sic] the trustee must show that there was a full and complete disclosure on his part of all the facts essential to an intelligent understanding by the beneficiaries of the subject matter and the consequences of the transaction." *Id.* at 221, 111 A.2d at 211.

PNC did not provide the Beneficiaries with full information explaining their rights or the consequences of their signing of the Agreement.[14] Importantly, PNC failed to explain to the

---

13. Furthermore, in obtaining the consent, the "trustee must not violate other fiduciary duties, such as the duty of prudence or impartiality. . . ." *Restatement (Third) of Trusts* § 78 cmt. g.

14. As discussed earlier, the Agreement not only failed to contain full information, but it also contained a misrepresentation. The Agreement stated that the Beneficiaries—rather than PNC—was the party initiating distribution of trust funds without court approval. Although this may seem like a minor misrepresentation, because there are four beneficiaries in this case (each receiving the Agreement), this statement has a great potential to mislead. After all, each of the four beneficiaries may

Beneficiaries how the liability protection it sought under the Agreement was more favorable to the bank than the protection it would have received upon the court's approval of a final accounting.[15]

Furthermore, PNC's demanding tone demonstrates that PNC failed to give the Beneficiaries "full and complete information" or explain that they were free to reject the Agreement's sweeping provisions and go to court. In at least two communications with the Beneficiaries, PNC stated that— unless the Beneficiaries executed the Agreement—it would not be "in a position" to distribute the trust funds. For instance, in the closing line of the letter accompanying the Agreement, PNC stated: "Upon receipt of the executed Releases from *all* of the distributees, we will be in a position to have the cash disbursed." (Emphasis in original.) Even the Circuit Court, which ultimately held that there was no "demand,"[16] agreed that "any reasonable person looking at PNC's correspondence would understand that PNC Bank was not going to release funds until all of the beneficiaries had signed off on this agreement."[17]

Unlike the Majority, I do not find comfort in the Beneficiaries' purported ability to reject a disadvantageous proposal.

---

have gotten the impression that the other three beneficiaries had requested distribution of trust funds in this manner, when, in fact, they had not.

15. PNC seemingly was impatient with explanations. Although the Beneficiaries insisted upon explanation of PNC's tax and fees calculations, those requests seem to have irritated PNC. In one letter to the Beneficiaries, PNC wrote: "The trust document that you request is in your possession.... Your other questions about fees and taxes are adequately addressed in [prior] correspondence to you. Nevertheless, I will attempt to dissect this for you."

16. The Beneficiaries did not appeal this finding.

17. The court went on to say that "although that certainly is the import of PNC's correspondence as well as Mr. Lyons [sic] correspondence on behalf of PNC Bank, PNC Bank didn't in fact do that. They did release some of the money. Unfortunately that happened just as the Plaintiffs [sic] law suit was in the mail to the Court to be filed."

As a fiduciary—and especially as a fiduciary with superior knowledge on the transaction in issue—PNC was only permitted to engage in negotiations of an agreement advantageous to it upon full and complete disclosure to the Beneficiaries of all relevant information. *See McDaniel,* 206 Md. at 220, 111 A.2d at 210. This record reveals no such disclosure.[18] We should not condone the practice of a bank's asking beneficiaries to provide the bank insurance against the bank's own blunders.

For these reasons, I dissent.

Chief Judge BELL and Judge GREENE have authorized me to say that they join this dissenting opinion.

18. As a PNC lawyer has written, it may be "time consuming and difficult to get beneficiaries to understand" the process of trust termination. Robert Owings, Esq., C.F.P., PNC Bank, *Closing Up Shop: Wrapping Up the Trust, in* Being the Trustee: Understanding Role and Responsibilities 173 (MSBA 2012). But, as a trustee, PNC owes trustee beneficiaries the duty to provide full and complete information.